433 So.2d 96 (1983)
STATE of Louisiana
v.
James Alton STOKES.
No. 82-KA-1050.
Supreme Court of Louisiana.
May 23, 1983.
Rehearing Denied June 24, 1983.
*97 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Norval J. Rhodes, Dist. Atty., Alexander Doyle, Asst. Dist. Atty., for plaintiff-appellee.
Charles Gary Blaize, Warren Daigle, Indigent Defender Board, Houma, for defendant-appellant.
BLANCHE, Justice.
Defendant James Alton Stokes, was indicted on February 16, 1978 for the crime of first degree murder. On January 19, 1982, the state amended the indictment to charge the defendant with second degree murder, a violation of La.R.S. 14:30.1. The defendant was tried before a jury and found guilty as charged by a unanimous verdict. Defendant Stokes was then sentenced to life imprisonment at hard labor without benefit of parole for forty years.
On appeal, the defendant relies on thirtynine assignments of error. In this opinion, we treat assignments number 1-2, 11-15, and 35. None of the remaining assignments of error present reversible error, and they involve legal issues which are governed by clearly established principles of law. Therefore, they will be treated in an unpublished appendix which will comprise part of the record in this case.
FACTS
On February 6, 1978, the Houma City Police received a call that there was an abandoned silver-gray Corvette in the parking lot of the Municipal Auditorium. Two officers responded to the call, searched the vehicle and discovered the body of Theresa Trosclair Fontenot in the front seat. Fontenot's body was wrapped in a bedspread, and two pillowcases were found between her legs. Her clothes were ripped.
An autopsy was performed on the victim's body by the assistant coroner of Terrebonne Parish. He noted in his report and testified at trial that she died from a broken neck. Numerous puncture wounds and bite marks on Fontenot's body were observed by the assistant coroner as well as scratches around the area of her neck. A torn muscle in the perianal area indicated a possible rape. The victim's blood was typed as group "O". At trial, the assistant coroner estimated the time of death to be within two days of the time of the autopsy.
The state sought to prove at trial that the defendant, James Stokes, caught a ride with the victim after she left work on February *98 4, 1978. He then allegedly forced her to drive to his apartment where he raped and murdered her.
Several witnesses were called by the state to testify at trial to support its theory. Officers of the Houma City Police Department, who investigated the murder, testified that they searched the defendant's apartment with his permission on February 7, 1978 and found blood stains on the walls and ceiling. A gold cigarette lighter was discovered in a metal box in the defendant's bedroom. Stokes was then arrested and brought to the police station for questioning. At the station, the defendant admitted that he was given a ride by Fontenot after she left work on February 4th. However, Stokes maintained that Fontenot dropped him off a few minutes later.
Sergeant Null testified that the car in which the body was discovered was parked approximately two blocks from the defendant's apartment. Keys to the car were found in the street between the car and Stokes' apartment.
A co-employee of the victim at the Satellite Lounge testified that she observed the defendant speaking to Fontenot in the lounge on the night the murder allegedly occurred. A week before, Stokes had asked her for a ride home.
John Gros, the victim's boyfriend, identified the cigarette lighter found by the investigating officers in Stokes' apartment as the same lighter he gave to the victim several days before the murder.
The defendant's landlady, who supplied linen to the defendant's apartment, identified the bedspread which had wrapped the victim's body. She testified that it was the same bedspread that was in Stokes' bedroom. She also identified the two pillowcases discovered with the body as similar to the type she used in her apartments. The landlady further stated that she had noticed that the bedspread and pillowcases were missing several days after the murder.
Blood scrapings taken from the defendant's bedroom were typed as group "A". This fact presented a problem to the state since the assistant coroner's report listed the victim's blood type as "O". The state, therefore, sought to establish that the coroner had mistyped Fontenot's blood. A forensic serologist testified that type "A" blood was found on the bedspread, the pillowcases and the victim's clothing. She further stated that the blood types can change when the blood decomposes. The defendant had type "O" blood. In addition, the state introduced the victim's 1974-5 medical chart which noted the victim blood type as "A".
Head hair and pubic hair found on the victim's clothing was analyzed to be similar to the defendant's hair.
The defense focused on the fact that the victim's blood was typed as "O" on the coroner's report. A pathologist testified that blood type does not change as it decomposes. The defense also called one witness to vouch for the good character of the defendant.

Assignment of Errors Nos. 1, 2
By these assignments, defendant urges that the state failed to carry its heavy burden of proving that the three year prescriptive period for commencing trial, set forth in C.Cr.P. art. 578, had been interrupted. See C.Cr.P. art. 579. Consequently, defendant argues that the trial court erred in denying his motion to quash the indictment.[1]
On February 16, 1978, defendant Stokes was indicted for the first degree murder of Theresa Trosclair Fontenot. He was confined to the Terrebonne Parish Prison to await trial. Inexplicably, in either September or October of 1978, the defendant was able to free himself from prison and travel to Florida. It was not until November, 1980, that the defendant was rearrested and returned to Louisiana. Trial commenced on January 19, 1982.
*99 La.C.Cr.P. art. 578(1) provides that no trial shall be commenced in capital cases after three years from the date of the institution of the prosecution. Obviously, in the case at bar, more than three years had elapsed between the date of the indictment and the date of trial. Hence, unless there was an interruption or suspension of the prescriptive period as provided in La.C.Cr.P. arts. 579 and 580, the trial court should have dismissed the indictment. See La.C. Cr.P. art. 581; State v. Williams, 414 So.2d 767 (La.1982). The state bears the heavy burden of proving that the prescriptive period set forth in La.C.Cr.P. art. 578 has been interrupted or suspended. State v. Amarena, 426 So.2d 613 (La.1983); State v. Nations, 420 So.2d 967 (La.1982); State v. Driever, 347 So.2d 1132 (La.1977).
At the hearing on the motion to quash, the state sought to prove that the defendant had escaped prison in September of 1978 and remained in Florida in order to avoid prosecution. Therefore, the state contended that prescription had been interrupted under subsection 1 of art. 578 which provides:
The period of limitation established by Article 578 shall be interrupted if:
(1) The defendant at any time, with the purpose to avoid detection, apprehension, or prosecution, flees from the state, is outside the state, or is absent from his usual place of abode within the state.
On the other hand, the defendant argued that he was released from prison in October, 1978 and then traveled to Florida to visit his parents. He contended that he had no intention to avoid prosecution as evidenced by the fact that he used his own name while residing with his parents in Florida.
Several witnesses testified for the defendant at the motion to quash. The defendant himself took the stand and gave the following explanation for his disappearance from 1978 until November, 1980: In October, 1978, he was released from his maximum security cell at Terrebonne Parish Prison by one of the prison employees, Cleveland Ross. Thinking that the charges had been dropped, he hitched a ride to New Orleans and then traveled by bus from New Orleans to Crawfordville, Florida. While in Crawfordville, he lived with his parents under his own name. During his stay in Florida, he worked for a logging company, drew disability payments, secured a Florida driver's license and even enlisted in the U.S. Army, all under his own name. Twice while in Florida, the authorities ran an NCIC computer check on him to determine if he was wanted in any state for committing crimes. On one occasion, he turned himself in to Florida police to clear his name on an old Mississippi criminal charge. The Florida police checked on the computer, found nothing, and told him to go home. The second time a computer check was run was when he enlisted in the Army in August, 1980. Again, the NCIC computer failed to show that he was wanted on criminal charges in any state. In November of 1980, while enrolled in Army boot camp in Kentucky, the F.B.I. rearrested him for the present offense.
On cross-examination, the defendant admitted that he had lived in Houma at the time of his arrest. Yet, when he was released from prison, he only spent forty-five minutes in Houma before hitching a ride to New Orleans. Defendant conceded that he had never informed the Terrebonne Parish Police, prior to his release from prison, that his parents lived in Crawfordville, Florida. He also admitted that, after his release from prison, he had never contacted the Terrebonne Parish Police and had not communicated with anyone in Houma. In addition, he had not informed the Army of his Louisiana arrest. He could not recall whether he ever informed the Florida police of his arrest in Louisiana.
The defendant's father and stepmother both testified that the defendant lived with them under his own name.
The state called several witnesses to refute the defendant's testimony. Neal Taylor, the assistant warden at Terrebonne Parish Prison, stated that the defendant had not been released and that there was some evidence of escape. Cleveland Ross, *100 the prison employee named by the defendant as the one who released him, testified that he had not freed the defendant. Detective Perkins of the Terrebonne Parish Sheriff's Office testified that he had compiled a list of addresses from letters he had found in the defendant's cell. Perkins stated that he had contacted law enforcement agencies in each of these places and had requested that they be on the lookout for Stokes. None of the agencies had ever contacted Perkins again. Also, Perkins asserted that he had placed "wanted" information on the defendant into the NCIC computer. However, due either to computer or operator error, the information was not properly registered in the computer. Therefore, anyone checking NCIC would have been unable to obtain the information on the defendant.
We find, in this case, that the state has met its heavy burden of showing that the prescriptive period was interrupted under C.Cr.P. art. 579(1). The prosecution has sufficiently established that the defendant Stokes escaped from the Terrebonne Parish prison, traveled to Florida and remained in Florida for the purpose of avoiding prosecution. Prison authorities testified that the defendant had not been released. There was evidence of an escape. The jailer, who allegedly freed the defendant, testified he had not done so. Once outside the prison, Stokes remained in Houma for only a few minutes, even though he resided in Houma at the time of his arrest. He traveled to Florida and never returned to Louisiana. He never informed Terrebonne Parish officials or anyone in Houma of his location in Florida. Although he enlisted in the Army, he failed to reveal to them the fact that he had been arrested in Louisiana.
We conclude, therefore, that the trial court's decision to deny the motion to quash was proper. The prescriptive period was interrupted by the defendant's escape in October, 1978 and did not commence to run new until November of 1980, when the F.B.I. rearrested the defendant and notified the Terrebonne Parish authorities. See La. C.Cr.P. art. 579; State v. Howard, 325 So.2d 812 (La.1976); State v. Montgomery, 257 La. 461, 242 So.2d 818 (La.1970).
The defendant further argues that since the prosecutor amended the grand jury indictment and reduced the charge to second-degree murder, the two year prescriptive period should apply. See La.C.Cr.P. art. 578(2). However, even if we agreed with the defendant's argument, the prescription period has not run. Trial was commenced fourteen months after the defendant's rearrest in November of 1980.
This assignment has no merit.

Assignments of Error Nos. 11, 12, 13, 14, 15
By these assignments, the defendant contends that the trial court erroneously admitted several of the state's documentary exhibits into evidence.
Four separate documents are in dispute. Each is part of Theresa Trosclair's 1974-5 obstetric chart. State's exhibit # 4 and # 7 are medical forms which have been filled in with Trosclair's name, address, and medical history. State's exhibit # 5 is a report containing the results of Trosclair's prenatal blood test. State's exhibit # 6 is another medical form which sets forth the date and time of the delivery of Trosclair's baby.
Exhibits # 4-7 were introduced to support the state's position that the victim's blood type was "A" and not "O" as listed in the assistant coroner's autopsy report. State's exhibit # 5, the prenatal blood test, shows that Theresa Trosclair's blood was typed as "A". The state offered exhibits # 4, 6 and 7 only to establish that the Theresa Trosclair whose name appeared on state's exhibit # 5 was the same person as the victim, Theresa Trosclair Fontenot.
The prosecution sought to lay a foundation for the admission of the four documents through the testimony of Mattie Sue Sherrouse, a registered medical technologist. Sherrouse testified that she was employed by Trosclair's obstetrician to obtain blood samples from the patients and then type the blood. On direct examination, she identified each of the state's exhibits as *101 originating from the obstetrician's office where she worked. In addition, she stated that she personally completed state's exhibit # 5. She explained the normal procedure in the obstetrician's office as follows: The patient, upon her initial visit to the office, supplies her name, address, and other identifying information as well as her medical history to a receptionist. The receptionist records this information on forms such as state's exhibit # 4 and # 7. These documents are placed in the patient's chart. The doctor then examines the patient to determine if she is pregnant. If the patient is indeed pregnant, she is sent to Sherrouse who draws a blood sample and types the blood. Sherrouse writes the results of the blood test on a form resembling state's exhibit # 5. This form is also placed in the patient's chart. When the child is born, the obstetrician relays the information regarding the date and time of birth to a nurse under his employ. This nurse records the information on a form such as state's exhibit # 6. Again, the form is included in the patient's chart. The chart itself is permanently stored in the office where Sherrouse works.
The defendant objected to the admission of state's exhibits # 4, 6, and 7 on the basis that they were inadmissible hearsay evidence. Although the trial court found the records to be hearsay evidence, it admitted the exhibits under the "business records" exception.
Prior decisions by this court have recognized a business records exception to the hearsay rule in criminal cases. State v. Perniciaro, 374 So.2d 1244 (La.1978); State v. Monroe, 345 So.2d 1185 (La.1977). In State v. Monroe, 345 So.2d 1185 (La.1977), we set forth the elements of this exception in the following manner:
"... Before the exception may be invoked by the state against the defendant, allowing introduction of a permanent record made in the ordinary course of business from personal knowledge of the facts recorded, or from information furnished by one having a business duty to observe and report the facts, it must be shown that the person who made the record is genuinely unavailable for testimony, that he had no strong motive to misrepresent, and that in all probability the evidence is trustworthy..." See also State v. Parker, 421 So.2d 834 (La.1982); State v. Phagans, 412 So.2d 580 (La.1982).
Applying the above criteria to our present case, we find that the trial court incorrectly admitted state's exhibits # 4 and # 7 into evidence. Initially, we note that the business records exception is limited to documents which have been completed either from the personal knowledge of the maker or from information transmitted to the maker by one having a business duty to observe and report the facts.[2] Exhibits # 4 and # 7 fail this requirement, for the receptionist, who recorded the information, did not possess personal knowledge of the facts included therein. The information contained in these records was supplied by the patient who had no business duty to report the facts.
We are also concerned with the trustworthiness of state's exhibits # 4 and # 7. These documents were offered solely for the purpose of showing that the patient *102 named in the obstetric chart was the victim. The patient, in this case had a motive to misrepresent her identity, for she was unmarried and possibly pregnant. Moreover, the effectiveness of the doctor's examination did not depend upon the accuracy of this identifying data.
The trial court also erroneously admitted exhibit # 6 into evidence. There was no showing made by the prosecutor that the nurse who recorded the information was unavailable for testimony. The state must prove that the witness is truly not available for trial despite diligent and good faith effort to produce her or the business records exception is not applicable. State v. Monroe, 345 So.2d 1185, 1190 (La.1977).
Without the foundation established through exhibits # 4, 6, and 7, the prenatal blood test report, exhibit # 5, was improperly admitted into evidence. Exhibit # 5 included only the name "Miss Theresa Trosclair" in the report. There was no other identifying information to link the person named in the report to the victim in this case, Theresa Trosclair Fontenot. Mattie Sherrouse, the person who completed the blood test report, testified that she could not describe the patient referred to in her report.
We conclude, therefore, that Theresa Trosclair's obstetric chart was erroneously admitted into evidence.
The question remains, however, whether the trial court's rulings were harmless error. By La.C.Cr.P. art. 921, an error shall be considered harmless unless it effects the substantial rights of the accused. This Court has employed the standard enunciated in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) as a guide in the determination of whether the error was harmless. State v. Landry, 414 So.2d 674 (La.1982); State v. Gibson, 391 So.2d 421 (La.1980). The Chapman test provides that, in order to find the error harmless, we must determine "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction", and we "must be able to declare a belief that [the error] was harmless beyond a reasonable doubt."
In our view, there is not a reasonable possibility that the obstetric chart contributed to the verdict. The state established that the defendant had blood type "O". Yet, type "A" human blood stains were discovered in the defendant's apartment three days after the date the murder allegedly occurred. These stains were located on the wall near the defendant's bed and on the ceiling over his bed. An analysis of the blood stains on the clothing worn by the victim when her body was discovered revealed type "A" human blood on the victim's blouse, pantyhose and denim skirt. Type "A" human blood was also found on the pillowcases and bedspread which wrapped the victim's body. Hence, viewed in this context, the corroborative effect of the blood test included in the obstetric chart was slight. It added little to the evidence presented by the state regarding the blood type of the victim.
We conclude, therefore, that no substantial right of the defendant has been violated. The trial court's errors were harmless beyond a reasonable doubt.

Assignment of Error No. 35
Defendant contends that the trial court committed reversible error when it refused to admit the written report of a teeth impressions analysis conducted by the state's expert.
On February 6, 1978, the assistant coroner of Terrebonne Parish performed an autopsy on the victim's body. He noted in his report that he observed two sets of puncture wounds, resembling bite-marks, on the legs of the victim.
Three months before trial, the state moved to compel the defendant to submit to the taking of an impression of his upper and lower teeth. The state contended that the impression was necessary in order to compare the defendant's teeth with the marks found on the victim. After a hearing on the matter, the trial court granted the state's motion. Out of fairness to the defendant, however, the trial court structured the test as follows: The teeth impression *103 of five different persons would be sent to the state's expert for analysis. Four of the impressions would be from male Caucasians within ten years of the defendant's age. The defense and state would each select two of the persons giving the impressions. The fifth impression sample would be that of the defendant. The identity of the five persons submitting impressions would not be disclosed to the expert. This would insure that the test would be conducted in a nonsuggestive manner.
The five impressions were made and sent to the state's expert, Dr. Vincent Lagattuta (a dentist), for comparison with photographs taken of the bite-marks on the victim. On November 17, 1981, Dr. Lagattuta mailed a written report of his findings to the District Attorney. In the report, Dr. Lagattuta concludes that there was not enough evidence to positively identify the suspect. He also states that he could not exclude any of the persons submitting impressions from consideration as having produced the bite-marks on the victim. A copy of this report was presented by the prosecutor to the defense counsel on the day of trial.
After the jurors were sworn but before the reading of the indictment, defense counsel notified the trial court that it wanted to introduce Dr. Lagattuta's report into evidence during the trial. The trial judge stated that he had no intention of allowing the report into evidence without the testimony of Dr. Lagattuta when the latter was available for subpoena. On defense counsel's request, the court designated the defendant's investigator to serve an instanter subpoena on Dr. Lagattuta.
After the state rested its case, the defendant again sought to introduce the report of Dr. Lagattuta without the testimony of the doctor. He argued that the report should be allowed in evidence under the business records exception to the hearsay rule. He also contended that he would be prejudiced by the fact that he would be required to call Dr. Lagattuta on direct examination. The trial judge refused to admit the report into evidence due to the fact that Dr. Lagattuta was available for testimony.
We find no error in the trial court's ruling. Dr. Lagattuta's report was inadmissible hearsay evidence. See La.R.S. 15:434. The written report contained out-of-court statements made by Dr. Lagatutta which were offered by the defense to show the truth of test results contained therein. See State v. Tonubbee, 420 So.2d 126 (La. 1982); State v. Smith, 418 So.2d 515 (La. 1982). The value of the statements included in the report rested upon the credibility of the doctor who performed the test.
The report was not admissible under the business records exception to the hearsay rule. See discussion of Assignments of Error Nos. 11-14, supra. Defense counsel made no showing that Dr. Lagattuta was unavailable for testimony. See State v. Stucke, 419 So.2d 939 (La.1982). An investigator for the defense was designated by the court to serve a subpoena on the doctor, and defense counsel gave no explanation as to why the doctor could not testify. In addition, the defendant offered no witnesses, familiar with Dr. Lagattuta's business procedure, to identify the report. Finally, the document itself may not be reliable. Without the testimony of the doctor, it would be difficult to assess the validity of the test upon which the opinions of the doctor expressed in the report were based.
Furthermore, we find no merit to the defendant's contention that he would be prejudiced by calling Dr. Lagattuta on direct. In effect, the defendant is willing to vouch for the credibility of the doctor's conclusions included in his report. Yet, he refuses to vouch for the credibility of the doctor's testimony which would explain how he arrived at his conclusions.

DECREE
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
CALOGERO, MARCUS and DENNIS, JJ., concur.
NOTES
[1] This court denied the defendant's application for supervisory writs on this identical issue. (82-K-0146).
[2] This requirement of the business records exception confronts the "double hearsay" problem which is often experienced with documentary evidence. See generally C. McCormick, Evidence, § 310, 313 (Cleary ed. 1972). The concern underlying this requirement is one of reliability, as expressed in the Advisory Committee Notes of the Proposed Federal Rules of Evidence:

"Sources of information presented no substantial problem with ordinary business records. All participants, including the observer or participant furnishing the information to be recorded, were acting routinely, under a duty of accuracy, with employer reliance on the result, or in short "in the regular course of business." If, however, the supplier of the information does not act in the regular course, an essential link is broken; the assurance of accuracy does not extend to the information itself, and the fact that it may be recorded with scrupulous accuracy is of no avail. An illustration is the police report incorporating information obtained from a bystander: the officer qualifies as acting in the regular course but the informant does not." See Advisory Committee Notes on FRE 803(6).