594 So.2d 467 (1991)
STATE of Louisiana
v.
Earl SMITH.
No. 89-KA-1853.
Court of Appeal of Louisiana, Fourth Circuit.
December 30, 1991.
Rehearing Denied February 25, 1992.
*468 John F. Rowley, Dist. Atty., Wayne J. McDougall, Asst. Dist. Atty., Chalmette, for plaintiff.
Dwight Doskey, Cherbonnier & Doskey, Harvey, for defendant.
Before WARD and ARMSTRONG, JJ., and GULOTTA, J. Pro Tem.
ARMSTRONG, Judge.
The defendant, Earl Smith, and his co-defendant, Raymond Smith, were charged by grand jury indictment with the first degree murder of Mario Gioe. The State amended the indictment to charge the defendants with second degree murder. Following a trial by a twelve-person jury the defendants were found guilty as charged. After sentencing, the defendants appealed the convictions. The convictions and sentences were affirmed by this Court, State v. Smith, 470 So.2d 128 (La.App. 4th Cir. 1985). On writs, the Supreme Court reversed both convictions. State v. Smith, 491 So.2d 641 (La.1986). The Court reversed the conviction of the co-defendant on the grounds that there was insufficient evidence and ordered his release. As to the defendant the Court remanded for retrial.
Following the reversal of the defendant's conviction, defense counsel filed supplemental discovery motions, including a request for the police report and a subpoena duces tecum to the sheriff's office to produce the report. The defendant also filed a motion for change of venue and a motion to recuse the district attorney. Following denial of all the motions, the defendant took writs to this Court (K-7044, unpub. February 4, 1987). The writ was granted as to the request for the initial police report and denied as to the motion to recuse the district attorney. The trial court's ruling on *469 the motion for change of venue was vacated, and the defense was told to re-urge the motion during voir dire. Writs were taken to the Supreme Court. The Supreme Court granted writ 87-KK-0465, 504 So.2d 68 in part and ordered that the assistant district attorney be recused; otherwise the judgment of this Court was affirmed.
Following receipt of the police report defendant filed a motion to exclude the testimony of Raul Vallecillo. Officer Vallecillo had been the investigating officer and had testified at the first trial. He died in 1984, and the trial court granted the State's motion to admit his prior testimony. Later, the trial court denied the defendant's motion to exclude Vallecillo's testimony. No writs were taken.
The State filed a motion to recuse the defense counsel, Dwight Doskey, on the grounds that he had represented the co-defendant Raymond Smith at the first trial. The trial court granted the motion, this Court affirmed on writs, and the Supreme Court reversed. The Court ordered that an evidentiary hearing be conducted at which the trial court should take any additional evidence to determine if a conflict exists and to fully inform the defendant of potential conflicts and to determine that the defendant understands and consents to any conflicts (87-KK-2791, 519 So.2d 770 (1988). The evidentiary hearing was conducted; the trial court denied the motion to recuse.
Finally, after the second trial a twelve-person jury found the defendant guilty as charged. He was sentenced to serve life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence.

STATEMENT OF THE FACTS
On January 6, 1983 at 6:11 a.m. the St. Bernard Sheriff's Office received a call regarding a body at the intersection of East Judge Perez and Riverbend Road. Two officers arrived at the scene and called for a detective. Officer Raul Vallecillo responded and arrived at the scene at 6:20 a.m. A body, later identified as the victim Mario Gioe, was found with two gunshot wounds to the head. His hands were tied behind his back with electrical cord and his pocket was turned inside out. According to the testimony of Officer Vallecillo, the body was still warm, there was blood coming from the victim's head, and steam was rising from the blood. Officer Vallecillo also testified that he found two bullets in the ground beneath the victim's head and a shoe print nearby.
Later on the same day, the victim's vehicle, a 1981 brown Z-28 Camaro, was found a few miles away. It had been wiped clean of fingerprints, except for a child's handprint on the sunroof.
Testimony at trial showed that the victim had received $500 in rent money on the evening before his death and that he had been wearing a watch, a ring, and a gold chain. None of these items were found on the body when it was discovered.
On January 18, 1983 a state trooper stopped a vehicle in which the defendant was a passenger. The vehicle was being driven by co-defendant Raymond Smith. A gun which was later identified as the murder weapon was recovered from under the driver's seat. The vehicle was owned by Raymond Smith's mother. Later, a search of Raymond Smith's residence resulted in the seizure of the box from which the gun originally came.
A search of the defendant's residence was conducted on January 25, 1983. The results of the search were the seizure of a door that had a footprint similar in type to the print found at the murder scene, a piece of electrical wire, and some shell casings. No tennis shoes were found. The search also revealed bullet holes in the kitchen ceiling of the residence.
Jerry Miller, a forensics expert, testified that the electrical wire seized at the defendant's residence was similar to the type used to bind the victim's hands, but did not come from the same piece. He also testified that the shoe prints were the same size, but he could not say they were from the same brand of shoes.
At trial, the State's main witness against the defendant was Margorie Molero. She testified that she left her daughter's home at 6:00 a.m. on the morning of the murder *470 and drove down Judge Perez Drive. As she approached Riverbend Dr. a car came out, cut in front of her, and made a U-turn on Judge Perez. As the car made the turn, she saw that the driver was a man, whom she later identified in a photo line-up as the defendant Earl Smith. She also identified a picture of the victim's car as the vehicle being driven by the defendant. She testified that she paid attention to the car because she was looking for a female coworker who drove a brown car.
On cross-examination, Mrs. Molero insisted that she left home at 6:00 a.m. and that it was probably around ten or eleven minutes past six when she encountered the defendant. She said that it was bright out and that she did not need her lights to drive, although she had them on. She could not say what model car her friend drove.
Expert testimony on the cause of death came from Dr. Paul McGarry of the New Orleans Coroner's Office. He testified that the cause of death was two contact gunshot wounds to the head. He further testified that the wounds were probably caused by .38 caliber bullets. Dr. McGarry stated that it was possible that death could have occurred as early as one hour before Detective Vallecillo saw the victim's body with steam rising from the blood.
Also testifying for the State was June Marino, who identified herself as the mistress of the victim. She testified that the victim called her at 1:30 a.m. on the morning of the murder. The victim stated that he was "going by my whore's house" which Ms. Marino interpreted as a reference to Lennie Bordelon. According to the witness, the victim was in the habit of seeing Ms. Bordelon for the purpose of engaging in oral sex, for which he paid her.
Two witnesses who worked with the victim at the restaurant of which he was a co-owner testified that they saw Lennie Bordelon come to the restaurant on various occasions. Lennie Bordelon would talk with the victim. One of the witnesses, Tommy Tommaseo, also identified the defendant and stated that he saw him with Ms. Bordelon on more than one occasion.
The defense presented several witnesses at trial. David Herberling testified that he made the shoe print on the door found at the defendant's house. Emile Delsburger testified to discovering the victim's body while on his way to work at around 6:00 a.m. After finding the body, Mr. Delsburger returned home and had his wife report the discovery to the Sheriff's Department. He then returned to the scene; officers were already there.
According to Mr. Delsburger, it was still dark and he had to put his bright lights on to see the body. He also testified that the officers were using flashlights to see and their cars had the headlights on.
Mrs. Delsburger testified that her husband left home before 6:00 a.m. and that it took him only a few minutes to return home after seeing the body. When Mrs. Delsburger called the Sheriff's Office, the body had already been reported.
Catherine Nye and Jules Nye testified that they were driving on Riverbend Road when they saw a body on the side of the road at the intersection of Riverbend and Judge Perez. As Mr. Nye got out of his car to investigate, a sheriff's car pulled up behind them and an officer told them to go on. Both witnesses testified that it was dark. Mr. Nye testified that he was driving with his bright lights on.
Lennie Bordelon testified for the defense. She stated that she and the defendant had been living together for seven months at the time of the murder. According to Ms. Bordelon, the defendant was home with her during the night and morning of the murder and that neither the victim nor anyone else visited. Ms. Bordelon denied having had any sexual relationship with the victim, but did state that she had known the victim for several years through her former husband.
Additional testimony included facts regarding the relationship between the defendant and his cousin Raymond Smith. Ms. Bordelon stated that it was Raymond Smith who had fired the shots into the kitchen ceiling at the defendant's residence and that Raymond Smith always carried a *471 gun similar to the murder weapon. She also testified that Raymond Smith was having an affair with a woman named Rebecca Nasworthy and that Ms. Nasworthy lived on the same street as the defendant.
The defendant took the stand in his defense. He corroborated the testimony of Lennie Bordelon in almost all respects. He denied having robbed or killed the victim. He also testified that he never wore tennis shoes because of a foot deformity.
On rebuttal, the State called Jeannie Darby who testified that she had lived three houses down from the defendant in January 1983. She testified that she had seen the victim's car parked in front of the defendant's house during the day in the first week of January and saw the victim leaving the defendant's house.
Also on rebuttal, Erroll Schultz, the photographer on the scene of the murder, testified that at 6:00 a.m. on the morning of the murder at his home in Arabi, he let his dog out in the yard and that he could see him.

ERRORS PATENT
A review of the records for errors patent reveals none.
However, defense counsel was unable to argue or present evidence that co-defendant, Raymond Smith, was responsible for the murder of Mario Gioe because he had represented Raymond Smith at the first trial and had agreed, in connection with the motion to recuse him, not to pursue that defense.
The record of the evidentiary hearing on the motion to recuse establishes that the defendant also agreed to waive his right to present the guilt of the co-defendant, Raymond Smith, as a defense. A review of that record clearly shows that the defendant waived his right to claim ineffective counsel because of the limitations placed on his defense counsel. Therefore, a conflict of interest, so obvious that it should be recognized as an error patent on the face of the record, must be ignored because it was waived by the defendant.
The defendant through counsel filed three assignments of error of which only one was briefed. The assignment was framed as "the trial court erred in not allowing the admission of relevant portions of the original police report authored by Raul Vallecillo." However, in the brief, counsel has restated the issue in three parts. The defendant argues that the trial court erred in (1) failing to exclude Detective Vallecillo's testimony or quash the indictment for Brady violations, or (2) failing to admit portions of his police report as a business record, or (3) or failing to admit portions of his police report as impeachment evidence.
The defendant first argues that the indictment against him should have been quashed because of Brady violations or that the testimony of Officer Vallecillo should have been excluded.
In order to preserve an issue for appellate review, a party must first direct his request or complaint to the trial court, by motion or exception. State v. Johnson, 404 So.2d 239 (La.1981); State v. Allen, 431 So.2d 808 (La.App. 4th Cir.1983); C.Cr.P. article 841.
In the instant matter, no motion to quash the indictment was ever filed by the defense. Therefore, the issue was never presented to the trial court and is being urged on appeal for the first time. Accordingly, we cannot now consider this argument.
The defendant did file a motion to exclude the testimony of Detective Vallecillo. The basis for the motion was that the initial police report, which the detective prepared and which was not made available to the defense until after the first trial and after the detective died, contained contradictions sufficient to undermine the credibility and reliability of the witnesses's testimony.[1]
*472 The defendant conceded in the pretrial motion and concedes on appeal that the State met most of the criteria for the admission of the deceased's witness's testimony. The criteria for admission of prior testimony are: (1) that the defendant was represented by counsel at the earlier hearing, (2) that the witness testified under oath, (3) that the witness was cross-examined or that there was a valid waiver of the right to cross-examine, (4) that at the time of the trial the witness is unavailable or unable to testify, and (5) that the State has made a good faith diligent effort to obtain the presence of the witness. State v. Robinson, 423 So.2d 1053 (La.1982).
The defendant's contention is that the third requirement was not met because, without the police report, the defense could not properly exercise the constitutional right to confront and cross-examine the witness. A critical portion of the defendant's argument is the assertion that the police report should have been provided to the defense prior to the first trial because it was exculpatory Brady material.
The due process clause of the Fourteenth Amendment to the United States Constitution requires the disclosure upon request of evidence which is favorable to the accused when the evidence is material to guilt or punishment. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This rule has been expanded to include evidence which impeaches the testimony of a witness where the reliability or credibility of the witness may be determinative of guilt or innocence. Giglio v. U.S., 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The Brady rule is based on the requirement of due process. "[T]he prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial, that is, evidence favorable to the defendant which is material to guilt or punishment." State v. Rosiere, 488 So.2d 965, 970 (La.1986). The test for determining materiality was established in United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." Bagley, 105 S.Ct. at 3384.
The police report does contain information which contradicts the trial testimony of Officer Vallecillo. The major contradictions are the notation in the report that the weather was foggy and that it was night when the officer arrived. The observation that it was night directly contradicts the trial testimony by Officer Vallecillo that "it was daybreak" when he arrived on the scene and that there was "some light. The observation noted in the report that the weather conditions were "foggy" and "damp" contradict the officer's testimony that it was not foggy in the area he was in.
These contradictions take on importance in this case because the major defense was that Margorie Molero, the witness who identified the defendant as the driver of the victim's car, could not see properly given the time of day and the weather conditions. Of all the witnesses who testified that they were at the scene of the murder at between 6:00 a.m. and 6:20 a.m., only Molero and Vallecillo testified that it was not pitch dark. Without the corroborating testimony of the police officer, and with the contradicting testimony of the four defense witnesses who were at the scene, there is at least a reasonable probability that the result of the proceeding would have been different. Therefore, under the standard enunciated in Bagley, supra, the police report contains evidence which is favorable to the defendant and which is material to his guilt.
*473 This conclusion is bolstered by other circumstances. At the conclusion of the first trial, the defense moved for a new trial based on newly discovered witnesses, to wit Mr. and Mrs. Delsburger.[2] In finding that the trial court did not err in denying the new trial, this Court stated that similar conflicting testimony was heard, and that "[T]he jury instead believed the police officers that there was light, and that of the identifying witness that there was light..." State v. Smith, supra, at 136. If the defense had had the opportunity to impeach the police officer's testimony with his prior "statements" as reflected on the police report, there would have been no such corroboration of the identifying witness's testimony that there was ample light by which to observe the defendant.
Although there are other minor inconsistencies in the police report, such as the fact that Officer Vallecillo personally discovered only one bullet, the other having been found by a fireman whereas at trial he testified that he found both bullets, the inconsistencies are not material to the defendant's guilt or innocence. The only evidence which is of direct importance was the testimony of Margorie Molero and the corroboration of her testimony by Officer Vallecillo.
However, as the defendant correctly notes, there was other information in the police report which was exculpatory, to wit, the information that a lady reported hearing gunshots from the direction of Riverbend and Judge Perez at between 4:30 a.m. and 5:30 a.m. on the morning of the murder. While this information has now been rendered useless by the death of Officer Vallecillo, it clearly was exculpatory because the only clear evidence inculpating the defendant was his being placed on the scene of the murder at approximately 6:00 a.m. If there had been evidence that the murder occurred much earlier, the outcome of the trial could well have been different.
Therefore, the police report should have been made available to the defense prior to the first trial because of the exculpatory material it contained.
It appears that the defense should have been able to impeach Officer Vallecillo at the first trial. Therefore, if the inability to impeach his testimony at the first trial constitutes a denial of the constitutional right to confront and cross-examine the witness, that testimony should have been excluded at the second trial.
The Second Circuit recently addressed a similar issue in State v. Magouirk, 539 So.2d 50 (La.App. 2 Cir.1988), appeal after remand, 561 So.2d 801, writ denied, 566 So.2d 983 (La.1990). In that case, the defense had called a witness at the preliminary examination for the perpetuation of testimony. After the witness testified adversely, the defense claimed surprise and sought to cross-examine the witness. That request was denied. At trial, the witness invoked the Fifth Amendment and was deemed unavailable. His prior testimony was then admitted into evidence on motion of the State. On appeal, it was held that admission of the testimony was reversible error. The court stated that it was unable to determine from the record that there had been "substantial compliance with the purposes behind the confrontation requirement." Magouirk, supra, at 57. The thrust of the court's reasoning was that merely being able to question the witness was not enough to satisfy the constitutional right to confront a witness. A critical portion of that right was to be able to impeach the witness, an opportunity which was denied the defendant in Magouirk.
The court further noted that the defense had not waived the right to impeach the witness simply because he had originally been called as a defense witness. In doing so, the court emphasized that procedural rules of evidence "cannot be mechanically applied so as to frustrate the constitutional rights of an accused and defeat the ends of justice." Id. On rehearing, the court did remand the matter for an evidentiary hearing to determine whether the witness had *474 become "unavailable" due to threats from the defendant, as alleged by the State in its application for rehearing. In all other regards, the court affirmed its original opinion. State v. Magouirk, supra, at 64.
Under the reasoning employed in Magouirk, denial of the right to a meaningful confrontation of a witness by impeachment, the testimony must be excluded.
Nevertheless, the defendant's inability to fully cross-examine Officer Vallecillo at the first trial would not require the exclusion of his testimony if the defense had the opportunity to impeach him later. State v. Magouirk, supra. Thus, we must determine whether the trial court properly refused to allow the defense to impeach Officer Vallecillo's testimony by introduction of the inconsistent statements in the police report.
The trial court denied the defendant's request to impeach Officer Vallecillo's testimony on the grounds that no foundation had been laid as required by R.S. 15:493 (now repealed). R.S. 15:493 provided in full that:
Whenever the credibility of a witness is to be impeached by proof of any statement made by him contradictory to his testimony, he must first be asked whether he has made such statement, and his attention must be called to the time, place and circumstances, and to the person to whom the alleged statement was made, in order that the witness may have an opportunity of explaining that which is prima facie contradictory. If the witness does not distinctly admit making such statement, evidence that he did make it is admissible.
In State v. Davis, 498 So.2d 723, 725 (La.1986) the Louisiana Supreme Court stated that the purpose of the foundation requirement is "not to exclude unreliable or otherwise objectionable evidence, but rather to avoid surprise and to insure that the witness has a fair opportunity to explain the inconsistency," citing McCormick on Evidence, Sec. 37 (E. Cleary 3rd Ed. 1984); State v. Heard, 408 So.2d 1247 (La. 1982).
In State v. Reed, 290 So.2d 835 (La.1974), the State introduced an unsworn taped statement made by a deceased defense witness whose preliminary hearing testimony had been read into the record. The Court found the introduction of the prior inconsistent statement to be reversible error because the codal requirement of laying the proper foundation had not been complied with. Reed, at 837. In so finding, the court stated that R.S. 15:493 "has always been strictly construed" and that "[T]he proper foundation must be laid." Id. The Court further stated that:
The jurisprudence has also construed this to mean there are no exceptions to this rule, not even for the death of a witness. The error was compounded by the fact that the statement was unsworn. (citations omitted). Additionally, the admission denied the defendant his right to confront the witnesses against him as provided for by the Sixth and Fourteenth Amendments to the United States Constitution and Article 1, Sec. 9 of the Louisiana Constitution. In the context of an inflammatory rape trial, the admission of this statement was highly prejudicial to the defendant.
Reed was relied upon by the trial court when it denied the defendant's motion to introduce the police report as a prior inconsistent statement.
The facts and the rationale of Reed can easily be distinguished from the instant case. In Reed the witness had been cross-examined by the State at the preliminary hearing. At that hearing, the defense had pointed out the witness's prior statement (which was made to the police around 4 a.m. on the night of the crime, at the police station while the witness was being interrogated regarding his own knowledge of the rape), but the State chose not to use the prior statement during its cross-examination. Reed, at 837.
Clearly, the considerations involved in Reed do not apply in the defendant's case. The defense was unaware of the officer's prior inconsistent statement at the time of the first trial, because the State failed to reveal exculpatory material, and thus could *475 not properly cross-examine or lay the required foundation. Furthermore while the Court in Reed had clear reservations about the voluntariness of the witness's prior statement, the prior statement in this case was made by a police officer while completing a routine form at which time he had no reason to enter erroneous information.[3] Lastly, the defendant's constitutional right to confront and cross-examine witnesses were prejudiced by the admission of the statement in Reed. In the instant case, the defendant's rights were prejudiced by the exclusion of the statement.
In Reed, the dissent argued that a growing minority view, included in various model rule of evidence, would allow the impeachment of a deceased witness without the necessity of laying a foundation under R.S. 15:493. Reed, at 838. The dissent proved prophetic. The new Louisiana Code of Evidence Article 806 provides, in pertinent part:
When a hearsay statement ... has been admitted in evidence, the credibility of the declarant may be attacked ... by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, offered to attack the declarant's credibility, is not subject to any requirement that he may have been afforded an opportunity to deny or explain....
The Official Comment (b) to Article 806 states that "[T]his Article changes Louisiana law by relaxing the foundation requirement that was strictly imposed in cases such as State v. Reed, 290 So.2d 835 (La. 1974) ..." Article 806 became effective on January 1, 1989. The defendant went to trial on October 3-6, 1988, less than three months before the new law. At the time of the trial, the new evidence law had already been approved, but was not in effect. If appellant were retried, the prior inconsistent statement made by Officer Vallecillo would be admissible.
The facts of Reed are distinguishable from the instant case. Furthermore, the defendant was not able to properly cross-examine the witness at the first trial because of the State's failure to furnish Brady material. Due process requires that the defendant's conviction be reversed and that he be given a new trial. Because the defendant can use Officer Vallecillo's prior statement for impeachment purposes at a new trial, there is no need to exclude his testimony, which is otherwise relevant and admissible.
At the time of this trial, there was no statutory provision for a business records exception to the hearsay rule. However, such an exception had been judicially recognized for some time. State v. Vessell, 450 So.2d 938 (La.1984); State v. Perniciaro, 374 So.2d 1244 (La.1979); State v. Monroe, 345 So.2d 1185 (La.1977). The requirements for admission of such evidence was stated in State v. Monroe, supra, and reiterated in State v. Vessell, at 944:
Before the exception may be invoked by the State against the defendant, allowing introduction of a permanent record made in the ordinary course of business from personal knowledge of the facts recorded, or from information furnished to one having business duty to observe and report the facts, it must be shown that the person who made the record is genuinely unavailable for testimony, that he had no strong motive to misrepresent, and that in all probability the evidence is trustworthy.
In the instant matter, there was no question that Officer Vallecillo was unavailable to testify. The defense offered the testimony of Officer Carreras for the purpose of identifying Officer Vallecillo's signature and to establish that the police report form was completed in the normal course of business under his supervision and at his direction.[4] The problem for the defense *476 was demonstrating that the information recorded in the report was provided or transmitted by someone who had a business duty to report the facts and that in all probability the evidence was trustworthy.
In State v. Stokes, 433 So.2d 96 (La. 1983), the Louisiana Supreme Court discussed the inherent "double hearsay" problem associated with the business record exception. The Court noted the reliability problems as expressed in Advisory Committee Notes of the Proposed Federal Rules of Evidence:
"Sources of information presented no substantial problem with ordinary business records. All participants, including the observer or participant furnishing the information to be recorded, were acting routinely, under a duty of accuracy, with employer reliance on the result, or in short `in the regular course of business.' If, however the supplier of the information does not act in the regular course, an essential link is broken; the assurance of accuracy is of no avail. An illustration is the police report incorporating information obtained from a bystander: the officer qualifies as acting in the regular course but the informant does not."
State v. Stokes, supra, at note 2, p. 101. The general rule making police reports inadmissible has now been codified in Louisiana. See Louisiana Code of Evidence, Article 803(8)(b)(i) and comments thereto.
At trial, the defense sought to put the police report into evidence by excising all portions which were not direct observations by Officer Vallecillo, thus removing the "double hearsay" problems inherent in police reports. Having removed the unreliable portions of the report, there appears to be no reason to have excluded the material. As noted in Stokes, the officer making the report is "acting in the regular course of business." Stokes, at 101. Furthermore, a prime reason for prohibiting the introduction of hearsay is the violation of the defendant's right to confront witnesses. In this case, the defendant was denied the effective right to cross-examination.
For the foregoing reasons the defendant's conviction is reversed and the case remanded for a new trial at which the defense should have an opportunity to impeach the testimony of Officer Vallecillo by use of the inconsistent statements in the police report.
REVERSED AND REMANDED.
NOTES
[1] It should be noted that the police report was provided to the defense only after the State was ordered to do so by this Court on supervisory review (writ K-7044). The police report was never made a part of the record, although a copy is attached to the defendant's brief. The trial transcript does indicate tha the defense made a proffer of the police report. The trial court denied the request for a proffer, stating that it was not "a proper vehicle to use in a criminal proceeding."

In the brief, defense counsel invites the State to agree that it is the report authored by Officer Vallecillo and delivered to counsel, thereby avoiding the necessity of a remand. Because the State did not file a brief, this Court accepts the defendant's exhibit as a part of the record.
[2] The fact that Emile Delsburger reported finding the body was included in the police report (p. 2.). The record does not indicate how the defense obtained his name immediately after the first trial and prior to receiving the police report.
[3] At the time the initial portion of the report was completed, the officer was unaware of the existence of Mrs. Molero. She did not contact the police until "a couple of days" after the murder, and then only after consulting her husband.
[4] Officer Carreras had earlier testified as a State witness and identified himself as a former commander in the St. Bernard Sheriff's Department.