450 So.2d 938 (1984)
STATE of Louisiana
v.
Norris VESSELL.
No. 82-KA-2599.
Supreme Court of Louisiana.
April 2, 1984.
*940 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., William R. Campbell, Paul Katz, Asst. Dist. Attys., for plaintiff-appellee.
Dwight Doskey, Clyde Merritt, Orleans Indigent Defender Program, New Orleans, for defendant-appellant.
BLANCHE, Judge.
Norris Vessell was indicted by an Orleans Parish grand jury for the October 9, 1976, first degree murder of Patricia Potter. La.R.S. 14:30 (1976).[1] Following the denial of his motion to suppress his confession, he exercised his right to a jury trial. The first three trials ended in mistrials (the last two with hung juries), but at a trial in May, 1980, the defendant was found guilty as charged. The jury unanimously recommended that he be sentenced to life imprisonment at hard labor, without benefit of parole.

FACTS
Both defendant and the victim, Patricia Potter, worked until approximately midnight on Friday, October 8, 1976. A short time later the victim, with defendant in her car, picked up Elizabeth Calix to give her a ride home from work. Before bringing Elizabeth home, Patricia told her that the defendant had invited her to go with him for a drink and that they might go to a pool hall near her house. She also asked Elizabeth to phone the next day. Elizabeth called, but received no answer.
Sunday morning Patricia's mother, somewhat concerned because she had not heard from her daughter, came to Elizabeth's house to inquire about her. The two went to Patricia's apartment, and although they found nothing unusual there, they did not find Patricia. Finally, Patricia's mother contacted the police to file a missing person report. Upon hearing that there was a woman in the morgue whose clothing fit the description of those Patricia had been wearing, Elizabeth went to the morgue and identified Patricia's body.
*941 Two members of the New Orleans Police Department testified that the victim's body was found lying in three or four inches of water where the Industrial Canal meets Lake Pontchartrain. The doctor who performed the autopsy testified that the hands and feet of the victim had been bound and that she had sustained five different blows to the area of the head, either with a blunt instrument or with a fist. Additionally, there was bruising in the neck, and dissection showed bleeding in the small muscles of the neck and around the thyroid gland. Based on the bruising pattern of the victim, the doctor stated it was his opinion that the victim had been bound while her heart was still beating. The doctor stated that the cause of death was either drowning or strangulation. On cross-examination the doctor said that it was not possible to pinpoint the time of death, but that the victim had been dead between four and twelve hours when he performed the autopsy at 11:30 a.m. Saturday.
Following the identification of the body, the officers went to defendant's home to question him because he was the last person known to have been with the victim. When Vessell denied knowing the victim, the police informed him that he was a suspect, informed him of his Miranda rights and asked that he come to the station with them for questioning. At the station, he gave a confession which is the subject of the first assignment of error discussed below. In that confession, he stated that after dropping Patricia's friend at her house, he and the victim went to a pool hall where they had two drinks and played pinball. They left there, went to the victim's apartment and played cards for about three hours. Defendant said that he told the victim he was going home because he was tired and that she attempted to restrain him. He pushed her away and started for the door, but she grabbed him again.
The statement goes on to describe a struggle between the two, ending with a punch to the victim's throat. The defendant attempted to administer mouth-to-mouth resuscitation when he realized that the victim was barely breathing, but this failed to revive her. The defendant then stated that, believing her dead, he bound her hands and feet, placed her in her car, and drove her to the lakefront, where he placed her body on the second step from the water. He then drove her car to the area of the Fairgrounds where he abandoned it.
Using the information obtained from the confession, the police located the victim's car where defendant said it had been abandoned. In a search of defendant's home, the police also seized a microphone taken from the victim's car.

Assignment of Error No. IV
In this assignment of error, the defendant complains of the erroneous admission into evidence of the inculpatory statement taken from him by the police. Defendant contends that the admission was improper because the state failed to rebut testimony by the defendant that the officials used coercion in the form of physical abuse to obtain the confession.
On direct examination by the State at the hearing on the motion to suppress, the arresting officers, Detectives LeBlanc and Cutrer, testified that they were alone with the defendant in the interrogation room and remained with him throughout the interrogation and until the transcription of the statement was completed. Each officer was asked by the prosecutor whether threats, promises or coercion had been used to obtain defendant's confession, and each responded in the negative. On cross-examination Detective LeBlanc conceded that he "may have left [the room] to go to the restroom or something along that line ..." Detective Cutrer also admitted that other people may have come in momentarily and then left.
The defendant's testimony on direct examination differed from the officers'. Vessell testified that several officers came and went from the interrogation room and that neither LeBlanc nor Cutrer were present at all times. He testified that when LeBlanc and Cutrer and two other officers became *942 frustrated with his repeatedly denying knowing the victim, one of the officers struck him. Vessell said he jumped up, and the officers left him alone for a few minutes, that one of them returned to reassure and calm him, and that while they were talking, the other three rushed in and handcuffed him to the chair. Vessell testified that one officer began toying with his weapon and threatening to do to Vessell what he "had done to Patricia." According to Vessell, a total of six officers were in the room at one time, and he testified that he was beaten in the head and chest, that one officer placed a plastic bag over his head, and that Detective LeBlanc slammed the typewriter into his back. Vessell said that the officers told him that he was not leaving the room until he told them what they wanted to know, and later threatened to arrest his wife and daughter if he continued to refuse to cooperate. Another officer allegedly told Vessell that if he did not answer the questions, he was going to be found in the lake. Vessell testified that twice during the interrogation he asked for a lawyer, but that his requests were ignored.
Vessell further testified that, upon being taken to parish prison, he told officials that he had been beaten and requested medical attention. He testified that a matron told him that she would get a court order from the magistrate that he be sent to a doctor. He testified that he was taken to Charity Hospital once, but that they were only taking emergencies that day, and so he was taken back a day later for examination.
According to Earl Cannon, the administrator and custodian of medical records for Orleans Parish Prison, it is routine prison procedure for someone from the medical department to ask incoming prisoners whether they are having medical problems and if they were injured while being arrested. According to prison records, which were admitted into evidence, Vessell said that he needed medical attention. The court order requesting that Vessell be taken to Charity Hospital was also made a part of the record. In addition, the physician who treated Vessell two days later testified that he had complained of a chest trauma and of coughing up blood several times. The doctor's records indicated that Vessell had a large bruise over the sternum and that x-rays showed no broken bones. Although she also testified that a blow of sufficient force to the sternum could cause accumulation of blood in the lungs due to the bruising, the doctor could not testify as to when the bruising had occurred.
The defendant's wife testified that he was not bruised or otherwise injured prior to his arrest, nor had he been coughing up blood. The defendant's mother testified that she had been with the defendant on the day of his arrest and that he had not complained of coughing blood and that as far as she knew he was not bruised, though she had not seen him without a shirt that day.
The State did not recall either LeBlanc or Cutrer to the stand, but cross examined the defendant about previous self-abusive behavior. This included the fact that he had attempted suicide once in the past and had been treated in the psychiatric wing at Charity Hospital. Vessell also admitted going on a limited hunger strike while in parish prison awaiting trial. When questioned about having beaten his head against his cell wall, Vessell denied the incident, but it had been recorded by medical personnel in the prison and those records were admitted into evidence.
Before a confession or inculpatory statement can be introduced in evidence, the State bears a heavy burden of proving affirmatively and beyond a reasonable doubt that it was made freely and voluntarily and not under the influence of fear, duress, intimidation, menace, threats, inducements or promises. C.Cr.P. art. 703; La.R.S. 15:451; State v. Bell, 395 So.2d 805 (La.1981); State v. Petterway, 403 So.2d 1157 (La.1981); State v. Franklin, 381 So.2d 826 (La.1980). When a defendant alleges specific instances of police misconduct in reference to the statement, it is incumbent upon the state to specifically *943 rebut the allegations. State v. Petterway, supra; State v. Dison, 396 So.2d 1254 (La. 1981); State v. Franklin, supra. However, the State need not wait until after the defendant's case in chief to meet the allegations, but may anticipatorily rebut a defendant's allegations of force or coercion. See, e.g., State v. Hills, 354 So.2d 186 (La.1977).
This is not a situation where the State simply failed to call witnesses which were known and available to it who could perhaps have specifically rebutted the defendant's allegations. Cf., State v. Simmons, 328 So.2d 149 (La.1976). On the contrary, it is the State's position that the two officers who testified were the only officers present during the interrogation. The officers also testified that no violence was used to obtain the confession. We are faced, therefore, with contradictory testimony which calls for a determination of the credibility of the witnesses. The trial court obviously disbelieved the version presented by Vessell and found credible the testimony of Officers Cutrer and LeBlanc. Such a determination is within the sound discretion of the trial court and, like all questions of fact, is entitled to great weight and will not be disturbed unless clearly contrary to the evidence. State v. Bell, 395 So.2d 805 (La. 1981); State v. Hudson, 361 So.2d 858 (La. 1978); State v. Cobbs, 350 So.2d 168 (La. 1977).
A review of the testimony shows that the trial court's findings of credibility and the finding of a knowing and voluntary confession based thereon are not contrary to the evidence. Officers Cutrer and LeBlanc testified that they were the only two police officials who participated in the interrogation of Vessell. Although LeBlanc acknowledged that he may have left the room to go to the restroom and Cutrer said that other people may have come and gone from the room, this is not to be unexpected in a busy police station and does not militate against the trial court finding that there were no other participants in the interrogation or the taking of the inculpatory statement. Although Vessell contended that from four to six other officers were involved in the alleged abuse, his testimony is far from clear or consistent in the number of persons present, and he neither named nor described the others whom he alleged to have used physical force to obtain his confession. Insofar as the medical testimony is concerned, the doctor could not testify as to how the bruise had been inflicted, nor could she state how long it had been present before her examination. For these reasons, we decline to disturb factual findings of the trial court that are well within its discretion.
This assignment of error lacks merit.

Assignment of Error No. 5
By this assignment of error, the defendant argues that the trial court erred in admitting documentary evidence under the business record exception to the hearsay rule.
The initial investigation of Potter's death led Detectives LeBlanc and Cutrer to her apartment at 225 N. Cortez Street. Inside, the officers found musical equipment and a phone book listing the number of an Eden Reyes, the victim's former boyfriend.[2] Reys had been living in the apartment with Potter but was in Albany, Georgia at the time of the offense. Cutrer then called Reyes from Potter's apartment. Over a timely hearsay objection by the defense,[3] the officer repeated the substance of his conversation with Reyes for the jury. Cutrer explained that he asked Reyes to tell him what he had left at the apartment and that Reyes listed several items of musical equipment, including two microphones in white cases. Cutrer stated that only one microphone was found at the apartment. When asked if he remembered the brand name of the microphones mentioned by *944 Reyes, Cutrer responded that he believed it was "Shure."
In his confession, Vessell admitted having taken a microphone from Potter's car before abandoning it and that the microphone was at his house. On the basis of that information, the officers secured a search warrant for defendant's residence and recovered the microphone, which was a "Shure" brand.
In its case-in-chief, the State called to the stand Julia Calahan, who stated that she was the custodian of records for Werlein's Music Store in New Orleans. Calahan brought with her copies of two documents: a sales contract and an "original delivery copy from our sales form" purporting to show the delivery of merchandise to an Eden Reyes at Potter's address on May 29, 1976.
Over a timely defense objection that the State planned to use the business record exception to the hearsay rule without first laying the proper foundation, Calahan read from the delivery form: "Two Sure [Shure] mikes, one stand, one set of base strings, and one Sony cassette recorder." Over renewed objections that the predicate for the business record exception had not been made, the State introduced the documents into evidence.
In this appeal the defendant cites as reversible error the trial court's failure to sustain the objections to the admission of this evidence. He argues that since the State failed to show that the person who had sold the equipment to Reyes or delivered it to him and actually made out the receipts was unavailable, the State failed to establish the predicate for the admission of the testimony.
The premise of defense counsel's argument is entirely correct. In State v. Monroe, 345 So.2d 1185 (La.1977), this court reaffirmed its original formulation of the business records exception to the hearsay rule:
Before the exception may be invoked by the State against the defendant, allowing introduction of a permanent record made in the ordinary course of business from personal knowledge of the facts recorded, or from information furnished to one having business duty to observe and report the facts, it must be shown that the person who made the record is genuinely unavailable for testimony, that he had no strong motive to misrepresent, and that in all probability the evidence is trustworthy. Id. at 1190.
Two years later this court referred to the requirement set out in Monroe and noted:
In view of the constitutional right of an accused to confront and cross-examine the witnesses against him, U.S. Const. Amend. VI: La. Const.1974, art. I, § 16, and the statutory prohibition against hearsay evidence, except as provided by law, La.R.S. 15:434, a broader business records exception for the admission of hearsay against a defendant in a criminal prosecution is unwarranted. State v. Perniciaro, 374 So.2d 1244, 1247 (La. 1979); See also, State v. Stokes, 433 So.2d 96 (La.1983), and State v. Vaughn, 378 So.2d 905 (La.1979).
In this case, Calahan freely admitted that she was not a salesperson and that she appeared in court only as the custodian of the records prepared by someone else. Since the State failed to account for the whereabouts of the original recorder, the trial court's rulings on the defense objections were clearly erroneous. State v. Monroe, supra; State v. Perniciaro, supra; State v. Phagans, 412 So.2d 580 (La.1982); State v. Juengain, 410 So.2d 1099 (La. 1982).
The defendant further contends that the erroneous admission of the business records evidence was not harmless error, and we agree.
In State v. Gibson, 391 So.2d 421 (La. 1980), this court adopted the standards enunciated in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) for determining what error may be deemed harmless: A reviewing court (1) must determine whether there is a reasonable possibility that erroneously admitted evidence might have contributed to the conviction, *945 and (2) must be able to declare a belief beyond a reasonable doubt that the error was harmless beyond a reasonable doubt.
The importance of this evidence in the jury's determination of guilt is inescapable. With the Werlein's document and Cutrer's hearsay account of his conversation with Reyes, the state had independent confirmation that the microphone found in defendant's apartment was almost certainly one of two delivered to Reyes at the victim's address, a place defendant claimed at trial he had never been. Without the inadmissible evidence, the two microphones were tied together only by the coincidence in the brand name and the statements made by the defendant in his confession, which he denied at trial. Indeed, in its closing arguments the State referred to this evidence as lending credibility to the defendant's confession as opposed to his testimony at trial. It is impossible for this court to say that the improperly admitted hearsay evidence was harmless beyond a reasonable doubt. Thus, this assignment of error calls for a reversal of the conviction and remand for a new trial.

Assignment of Error No. 6
By this assignment, the defendant urges that the trial court erred in allowing the State to present evidence of defendant's bad character when he had not placed his own character at issue.
The defendant claimed at trial that he had signed the pages of his confession in blank after a beating at the hands of several police officers that left him with bruises on his chest, back, and penis. The state responded to the allegations by suggesting that defendant had a history, in and out of parish prison, of inflicting injuries on himself. Defendant's repeated denials on cross examination that he had ever intentionally harmed himself led to the following exchange:
Q: So, you still insist that you have you've not inflicted injuries on yourself, is that correct?
A: Not intentionally.
Q: Now, in that regard, you consider yourself non-violent?
At this point defense counsel objected, contending that the question pertained to a character trait, but the trial court overruled the objection and the defendant asserted that he considered himself a non-violent person under normal conditions. The questioning continued:
Q: And, how [do] you feel about women in relation to violence?
A: What do you mean?
Q: Well, in your talking about abusing women?
A: I'm against that, totally.
Q: Okay. You think women should ever be touched or hit in any manner?
A: No.
Over objection that the State was impeaching defendant on a collateral matter and that it had not given proper Prieur notice, the prosecutor then brought Dorothy Ramsey into the courtroom and confronted defendant once more:
Q: Did you recognize this lady that was right here?
A: Yes, I did.
Q: And, who is she?
A: Used to be a girlfriend of mine.
Q: Do you know her name:
A: Dorothy.
Q: Pardon?
A: Dorothy. I forget her last name.
Q: Now, is your answer still correct, that you don't believe or inviolence against women?
A: That's right.
Q: And, you don't believe they should be abused, or hit in anyway [sic], is that correct?
A: That's true.
In its rebuttal case, the State called Dorothy Ramsey to the stand and the court allowed her to testify over defense objections that she was going to testify to a character trait and that the defendant had not placed his character at issue. In response to a question by the State as to whether the defendant had ever hurt her, *946 Ramsey testified that when she was fifteen years old "... he ... forced me to do something that I didn't want to do ..." The prosecutor then underscored the testimony for the jury:
Q: Did he use any physical force to make you do that?
A: Yes.
An accused who takes the stand in his own defense is subject to impeachment by discreditation as is any other witness. La.R.S. 15:434; State v. Prather, 290 So.2d 840 (La.1974). This right of the cross-examiner to impeach a defendant has its limits, however. One of those limitations is that the accused may introduce evidence of his character to show that he is not the type of person who would commit the particular crime charged, but until he does so his character is not at issue and may not be the subject of cross-examination. La.R.S. 15:481; See also, State v. Frentz, 354 So.2d 1007 (La.1979) and cases cited therein.
A review of the record makes it clear that the defendant did not place his character at issue at any point during his case in chief. In form, the prosecutor's questions to defendant called only for his opinion about the use of violence against women. In context, however, it called upon defendant to assess his character generally with regard to violence and in particular with regard to women. Since the defendant had not placed his character at issue, it was error for the trial court to overrule the defense objections to the line of questioning regarding his violent or non-violent nature.
Further, the obvious purpose of the State in confronting defendant with Ramsey on cross-examination was to elicit his admission or denial that he had, in fact, abused at least one woman in the past. When the defendant repeated his belief that women should not be abused, the State called Ramsey on rebuttal to testify to a specific act which contradicted defendant's assertion.
It was error to allow Ramsey's testimony on two counts. First, if the State sought to use her testimony to attack the general credibility of the defendant, the inquiry should have been limited to the witness's knowledge of the defendant's general reputation, rather than going into particular acts or conduct by the defendant. La.R.S. 15:491.
Second, La.R.S. 15:494 expressly provides that "[i]t is not competent to impeach a witness as to collateral facts or irrelevant matter." Discussing this provision in State v. Cappo, 345 So.2d 443, 444 (La.1977), this court noted that:
We have previously held that a witness cannot be cross-examined as to any fact which is collateral and irrelevant to the issue merely for the purpose of contradicting him by other evidence. (citations omitted) The rule is designed to avoid unnecessarily prolonging trials and confusing the issues by extended inquiries into extraneous matters. (citations omitted)
* * * * * *
Facts which could have been shown in evidence for any purpose independently of the contradiction are not collateral. Thus, facts relevant to some issue in the case or otherwise receivable for the purpose of impeaching the witness are provable in contradiction. (citation omitted)
Ramsey's testimony had no independent value as substantive evidence. Only two material issues of fact were actually disputed at trial: the identity of Potter's assailant and the intent with which he struck the victim. However, had the State intended to use Ramsey's testimony to prove identity, it would have had to demonstrate, inter alia, that "the modus operandi employed by the defendant in both the charged and uncharged offenses [was] so peculiarly distinctive that one must logically say they are the work of the same person ..." State v. Hatcher, 372 So.2d 1024, 1033 (La.1979) (on rehearing), and cases cited therein. That distinctiveness is clearly lacking here. In addition, the Ramsey incident had no probative value on the question of whether defendant had specifically *947 intended to kill Potter or inflict serious bodily harm, as it was otherwise clear from his confession, if believed, that he had struck the victim intentionally.
Again, we cannot say that the error by the trial court in allowing this testimony constituted harmless error. We find that there was a reasonable possibility that the erroneously admitted testimony might have contributed to the jury's finding of guilt. The State had trapped the defendant in a lie, which is no small gain before a jury in a case that turned entirely on a credibility choice between the defendant and the officers who claimed they had taken his confession. For these reasons, defendant's conviction must be reversed and the case remanded for a new trial.

Assignment of Error No. 9
By this assignment, the defendant contends that the trial court committed reversible error in failing to instruct the jury properly on reasonable doubt, as defined in La.C.Cr.P. art. 804.[4]
The defendant asked the trial judge to instruct the jury that "a reasonable doubt may arise either from the evidence in the case or the lack of evidence in the case." The judge refused to give the requested charge, and instructed the jury as follows:
You are prohibited by law and your oath from going beyond the evidence to seek for doubts upon which to acquit the defendant, but must confine yourselves strictly to a dispassionate consideration of the testimony given upon the trial. You must not resort to extraneous facts or circumstances in reaching your verdict. That is, you must not go beyond the evidence to find facts or circumstances creating doubts, but must restrict yourselves to the evidence that you heard on the trial of this case.
You are the exclusive judges of the facts. You are to find from the evidence which facts have been proved and which facts have not been proved. For this purpose, you determine the credibility of the witnesses, accordingly as you are impressed with his or her veracity.
Defense counsel objected in advance to this jury charge and renews that objection on appeal.
This instruction on reasonable doubt is identical to that which this court declared patently erroneous in State v. Gibbs, 355 So.2d 1299 (La.1978). In Gibbs the defendant only objected to the omission of the instruction that the jury could not go beyond the evidence to convict, and the court held that it was clear from the instructions taken as a whole that the trial court had adequately covered that matter. Gibbs, however, did not object to that part of the instruction which the court recognized as patently erroneous, and so the court did not reach that issue. Three years later, however, we held that instructions identical to the case at bar and those in Gibbs constituted reversible error. State v. Mack, 403 So.2d 8 (La.1981).
As was explained in a footnote in the Gibbs decision, and later in State v. McDaniel, 410 So.2d 754 (La.1982), and most recently in State v. Rault, 445 So.2d 1203 (1984), the error in such an instruction is not merely the omission of the statutory language that reasonable doubt may arise from the lack of evidence, but is that the trial judge specifically limited the jurors to the evidence before them to support a reasonable doubt and prohibited the jury from going outside the evidence to find reasonable doubt. As La.C.Cr.P. art. 804 makes perfectly clear, the jury is not restricted to the evidence adduced from the witness stand for the creation of reasonable doubt, but may find it from the lack of evidence.
In Mack this court mandated a reading of C.Cr.P. art 804 to the jury, but that ruling has recently been modified to *948 approve either a reading of the article or instructions substantially equivalent to the statute. State v. Rault, supra. We found the jury charge in Rault to be substantially equivalent to the statutory language, specifically contrasting it to the erroneous instructions in Mack, because the trial court gave a lengthy explanation of reasonable doubt and concluded by instructing the jury that it must determine what facts had been proved and what facts had not been proved. The instruction in the instant case is not substantially equivalent to the statute, but is in direct opposition to the statutory provision that the jury may find reasonable doubt from the lack of evidence adduced at trial. Although the State contends that the trial court instructed the jury in substance that it was to determine which facts had been proved and which had not, when the entire instructions are read as the jury heard them, it is evident that the judge was instructing not on the lack of evidence, but on credibility. Such an instruction constitutes reversible error for the reason we made clear in Mack: "A correct understanding of reasonable doubt is essential in every criminal jury trial." 403 So.2d 8, 11.

DECREE
For the reasons assigned, the conviction and sentence are reversed, and the cause remanded to the district court for a new trial.
REVERSED AND REMANDED.
DIXON, C.J., concurs with reasons.
LEMMON, J., concurs believing the conviction clearly must be reversed because of the erroneous instruction on reasonable doubt, but considers the discussion of any other reasons for reversal to be dicta.
DIXON, Chief Justice (concurring).
I respectfully concur.
Furthermore, it does not appear that the state carried its burden of proving the admissibility of the confession.
NOTES
[1] La.R.S. 14:30 (1976) read:

First degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm.
Whoever commits the crime of first degree murder shall be punished by death or life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence in accordance with the recommendation of the jury.
[2] The record spells the name interchangeably as [Eden or Edin or Eddie] Reyes or Rayes.
[3] Although defense counsel timely objected to this testimony as hearsay, the issue was neither briefed nor argued before this court, and so is considered abandoned.
[4] La.C.Cr.P. art. 804 provides, in pertinent part:

A. In all cases the court shall charge the jury that:
It is the duty of the jury, in considering the evidence and in applying to that evidence the law as given by the court, to give the defendant the benefit of every reasonable doubt arising out of the evidence or out of the lack of evidence in the case.