JOY COSSICH LOBRANO, Judge.
| defendant, Brandon Davis, was charged by bill of information with one count of armed robbery, a violation of La. R.S. 14:64, and one count of attempted armed robbery, a violation of La. R.S. 14:27, 14:64. He pled not guilty. Prior to trial, the State filed a motion to invoke the firearm sentencing provision of La.C.Cr.P. art. 893.3. Following a trial, the jury found Davis guilty of attempted armed robbery on each count.
Davis filed motions for a post verdict judgment of acquittal and a new trial, which the court denied on June 30, 2011. On the same date, the trial court sentenced Davis to serve fifteen years at hard labor on each count. The sentences were to run concurrent, and Davis received credit for time served.
Pursuant to the Habitual Offender Law, La. R.S. 15:529.1, the State charged Davis as a second felony offender. Following the multiple bill hearing, the trial court adjudicated Davis a second felony offender, vacated the previous sentences, and sentenced him to serve twenty-five years at hard labor on each count with credit for time served. The sentences were to run concurrent with any other sentence Davis was serving. Davis appealed his convictions and sentences.
li>New Orleans Police Department Detective Kelly Morel was the lead detective in this case. She testified that on September 29, 2010, she investigated an armed robbery that occurred at 1521 Crete Street. The victims of the robbery, a male identified as Tim Wehrle, and a female identified as Candida Pagan, told her that they were walking eastbound on Crete Street, when three unknown black males riding eastbound on bicycles told them “good night.” The victims responded, telling the three males “good night.” The males proceeded to dismount from their bicycles, brandish guns, and rob the victims. Wehrle informed Detective Morel that his keys and his wallet, containing two debit cards and a twenty dollar bill, were stolen. However, nothing was taken from Pagan.
When asked to describe the crime scene, Detective Morel noted that the crime occurred on a “fairly well-lit,” single lane street. Detective Morel did not apprehend any perpetrators on the evening of the incident; however, a suspect was eventually developed. The initial suspect, Jonathan Kuykendall, had been arrested for two prior armed robberies in the area and matched the description of one of the perpetrators. Detective Morel composed a six person color photographic lineup which included Kuykendall’s photograph and five other subjects with similar characteristics. The victims were separated and presented with two different lineups. Neither Wehrle nor Pagan was able to make an identification based on the lineup that was presented, and, at that point, Kuyken-dall was eliminated as a suspect.
According to Detective Morel, Davis was later developed as a suspect. Based on information, Detective Morel composed two more lineups that included individuals with similar characteristics. This time both Wehrle and Pagan [¡¡identified Davis as a suspect out of the photographic lineup. Once the victims made the identification, Detective Morel asked them to sign the front of the lineup and put their names, the time, and date on the back of the lineup.
Detective Morel also testified that she developed the name of Jonathan West as a suspect during this investigation. She again presented the victims with another set of lineups; however, the victims were unable to make an identification. As to the photo identification procedure, Detec *714 tive Morel explained that the photo lineups were performed at Wehrle’s house and the victims were in different rooms when the selection occurred. She presented the lineups first to Wehrle, who made his identification, and then to Pagan, who made hers.
On cross examination, Detective Morel testified the robbers were described as three black males, about sixteen to twenty years old, all wearing dark clothing, two with braids, and one with a short haircut. She prepared the arrest warrant and canvassed the area by knocking on doors, driving around, and looking for possible witnesses. Detective Morel received information from NOPD Detective McQueen in developing Davis as a suspect. When Pagan positively identified Davis, she told Detective Morel that he was the one who pointed the gun at her head and said “someone’s going to get shot tonight.”
NOPD Detective Robert Stoltz testified that he and his partner were patrolling the Fairgrounds neighborhood on the night of October 6, 2012, when they were flagged down by some neighborhood residents. Based on the conversation, he radioed into a dispatcher and subsequently performed an investigatory stop on a male (Davis) who was riding a bike a block from where the officers were flagged down. Detective Stoltz described Davis as having dreadlocks and wearing a baseball cap. After obtaining Davis’ name and address, |4he frisked Davis but found no firearms. After Detective Stolz determined that Davis was not wanted by the police, he allowed him ride away on his bike. Detective Stoltz could not positively identify Davis in court as the person he stopped on October 6, 2012.
Wehrle testified that on September 29, 2010, he and Pagan were walking down the street to his house when they noticed “three young black men on bikes” and moved to the sidewalk. Once the couple passed their car and got into the driveway, two of the men put their bikes down and pulled out weapons. The third man eventually got off of his bike, came from behind, went through their pockets, and took Wehrle’s car keys and wallet. Although Wehrle emphasized the other two individuals pointed guns directly at the couple during the robbery, he said he would not be able to identify either of them in court. However, he remembered meeting with the police and being presented with photographs. Wehrle said he and Pagan were not intoxicated that night and he believed the guns utilized in the robbery were silver and resembled Glocks. He described the perpetrators as individuals with medium builds, long black tee shirts, and dark shorts. He also noted that they were about six feet tall and probably one hundred fifty pounds, and that one of the individuals had dreadlocks. Wehrle verified that he was shown lineups other than the one that he signed; however, in the other lineups he did not recognize any of the individuals. He testified that no one told him whom to select and that Pagan did not tell him whom she had picked.
Pagan corroborated Wehrle’s testimony regarding the facts of the robbery. However, unlike Wehrle, Pagan identified Davis at trial as one of the robbers. Pagan said Davis, while pointing the gun at the couple, told them to give him what they had or “someone’s going to get shot.”
IfiOnce the men were satisfied that the couple had nothing else, the three men got onto their bikes and fled. Pagan testified that she had focused on Davis’ face during the robbery, explaining that the only thing going through her head during the ordeal was “don’t kill us” and “I need to remember your face.” Pagan provided the police with a description of the assailants on the evening of the incident. She also recalled *715 that on October 5 she had met with Detective Morel, who presented her with a photo lineup. Pagan verified her signature on the photo of the assailant. She explained that Detective Morel interviewed her and Wehrle in the same room; however, she did not see whom he selected from the photo lineup. She also did not hear or see anything that influenced her decision.
Davis testified that at time of the robbery he was living in New Orleans East with his girlfriend, pursuing his GED, and had a job at a company called Graphics. He claimed he never owned a gun and did not like guns. According to Davis, the night of the robbery, he was at Stallings Park playing basketball until about 7:00 p.m., and then went to a friend’s house on Dorgenois Street. After leaving the friend’s house, he caught the bus back to New Orleans East. He acknowledged that he rode his bike to the playground that evening, but he denied robbing anyone or knowing who committed the robbery in question. He left his bike at his friend’s house when he caught the bus to go home.
A review of the record reveals two patent errors with respect to Davis’ sentence. The record shows the trial court denied the defendant’s motions for new trial and for post-verdict judgment of acquittal on the day of sentencing. Under La. C. Cr. P. art. 873, a sentence shall not be imposed until twenty-four hours after a motion for new trial has been overruled. Moreover, Davis did not assert that an | fiexcessive sentence was an assignment of error. He was also resentenced as a multiple offender. This Court has held that the failure to observe the delay would be deemed harmless error where the defendant did not challenge his sentence on appeal. See State v. Riley, 2005-1311 (La.App. 4 Cir. 9/20/06), 941 So.2d 618. Accordingly, in the present case where no error is raised as to the defendant’s sentence, the failure of the trial court to observe the delay period is harmless error.
The second patent error reveals that the sentence imposed by the trial court is illegally lenient. Davis was initially sentenced to fifteen years at hard labor on each count. After being adjudicated a second offender, the trial court vacated the original sentences and resentenced the defendant under the multiple offender statute to twenty-five years at hard labor on each count. However, La. R.S. 15:529.1(G) provides that all sentences imposed under the statute are to be served without benefit of probation or suspension of sentence. However, paragraph A of La. R.S. 15:301.1 provides that in instances where the statutory restrictions are not recited at sentencing, they are included in the sentence given, regardless of whether or not they are imposed by the sentencing court.
Furthermore, in State v. Williams, 2000-1725 (La.11/28/01), 800 So.2d 790, the Louisiana Supreme Court ruled that paragraph A of the statute “self-activates the correction and eliminates the need to remand for a ministerial correction of an illegally lenient sentence^] which may result from the failure of the sentencing court to impose punishment in conformity with that provided in the statute.” Id. at 10, 800 So.2d at 799. Hence, this Court need take no action to correct the district court’s failure to specify that Davis’ sentence be served without the benefit of probation or suspension of sentence. The correction is statutorily ^effected. See also State v. Phillips, 2003-0304, p. 3(La.App. 4 Cir. 7/23/03), 853 So.2d 675, 677.
DISCUSSION
Davis’ sole assignment of error is that the evidence is insufficient to support his conviction for attempted armed robbery because the State failed to negate any *716 reasonable probability of misidentification. Specifically, Davis asserts that the identification was unreliable because neither witness had an opportunity to view the young men who committed this crime due to the dimness of the street lighting and the brevity of the encounter. Davis emphasizes that Wehrle “blanked out” during the incident and that Pagan could only give a general description of one of the men involved in the incident. On the other hand, the State argues that the evidence was sufficient to negate any reasonable probability of misidentification.
Generally, when assessing the sufficiency of evidence to support a conviction, the reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, a rational fact finder could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 309, 99 S.Ct. 2781, 2784, 61 L.Ed.2d 560 (1979). This review must include the whole record, as a rational fact finder does. State v. Mussall, 523 So.2d 1305,1310 (La.1988). If rational finders of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all of the evidence most favorable to the prosecution must be adopted. Id. It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence. State v. Johnson, 619 So.2d 1102 (La.App. 4 Cir.1993), citing State v. Rosiere, 488 So.2d 965, 968 (La.1986). Credibility determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the fact finder. State v. Brumfield, 93-2404, p. 5-6 (La.App.8 4 Cir. 6/15/94), 639 So.2d 312, 316. Moreover, conflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency. State v. Jones, 537 So.2d 1244, 1249 (La.App. 4 Cir.1989). Like all factual matters, credibility determinations are entitled to great weight and will not be disturbed unless contrary to the evidence. Id., citing State v. Vessell, 450 So.2d 938 (La.1984). Absent internal contradiction or irreconcilable conflict with the physical evidence, the testimony of a single witness, if believed by the fact finder, is sufficient to support a factual conclusion. State v. Marshall, 2004-3139, p. 9 (La.11/29/06), 943 So.2d 362, 369.
Furthermore, the State is required to negate any reasonable probability of misidentification. State v. Weary, 2003-3067 (La.4/24/06), 931 So.2d 297. The appellate court also reviews the reliability of an identification in accordance with the factors set out Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), which are: (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness’s degree of attention; (3) the accuracy of the witness’s prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. State v. Stewart, 2004-2219, p. 6 (La.App. 4 Cir. 6/29/05), 909 So.2d 636, 639.
Contrary to Davis’ argument, reviewing this case utilizing the Manson factors establishes that Pagan’s identification of Davis was reliable. Although the trial testimony indicates the street lighting was dim, Pagan testified that she focused on the assailant’s face during the robbery because she needed to remember it in the event she lived. This testimony alone establishes that Pagan had an opportunity to view the assailant at the time of the crime.
LThe testimony also indicates Pagan maintained a great deal of attention during the robbery, as she provided the police with a description of the assailants shortly after the incident. In fact, both Pagan and Wehrle were able to give a good recitation *717 of the facts that happened leading up to the robbery. Pagan testified that the robbery was three to four minutes long, and both victims testified that the three men involved in this incident spoke to them prior to robbing them. These factors indicate the victims were attentive during the robbery.
Although Wehrle “blacked out” during the robbery, Pagan was able to provide the investigating officers with a description of the assailant, noting he was wearing a black tee shirt, black cap, twisted chin length dreadlocks, and was her height. Pagan was also very certain in her selection of Davis as the assailant from the photo lineup.
Finally, even though the record indicates a substantial amount of time elapsed between the time that the crime was committed and the time Pagan viewed the photographic lineups, in view of the verdict, the jury believed her testimony. As noted by this court, a fact finder’s credibility determination is entitled to great weight and should not be disturbed unless it is contrary to the evidence. State v. Johnson, 2009-0259 (La.App. 4 Cir. 9/16/09), 22 So.3d 205[1]. In this instance, the trial court’s determination will not be disturbed.
Because we conclude the State negated any reasonable probability of misidentification, Davis’ convictions and sentences are affirmed.
AFFIRMED

. Writ den. 2009-2263 (La.4/16/10), 31 So.3d 1054.