# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 22-413


**STATE OF LOUISIANA**

**VERSUS**

**JEREMY LANCE MORROW**


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 349,165
HONORABLE LOWELL C. HAZEL, DISTRICT JUDGE


**\*\*\*\*\*\*\*\*\*\***


**ELIZABETH A. PICKETT**
**CHIEF JUDGE**


**\*\*\*\*\*\*\*\*\*\***


Court composed of Elizabeth A. Pickett, Jonathan W. Perry, and Ledricka J. Thierry, Judges.


**AFFIRMED.**


**Franz Borghardt**
**Borghardt Law Firm**
**301 St. Ferdinand Street**
**Baton Rouge, La 70802**
**(225) 831-1465**
**COUNSEL FOR DEFENDANT- APPELLANT:**
     **Jeremy Lance Morrow**

**Jacob Longman**
**Kathryn Jakuback Burke**
**F. Richard Sprinkle**
**Longman Jakuback, APLC**
**830 Main Street**
**Baton Rouge, LA 70802**
**(225) 383-3644**
**COUNSEL FOR DEFENDANT- APPELLANT:**
     **Jeremy Lance Morrow**

**Jeff Landry**
**Attorney General**
**J. Taylor Gray**
**M. Joseph LeBeau**
**Assistant Attorneys General**
**PO Box 94005**
**Baton Rouge, LA 70804**
**(225) 326-6200**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**PICKETT, Judge.**

## PROCEEDINGS BELOW

On December 15, 2020, the defendant, Jeremy Lance Morrow, was charged by bill of indictment with one count of malfeasance in offense, in violation of La.R.S. 14:134. Specifically, the defendant was charged with "committing a battery against the person of another while acting in his official capacity as a Rapides Parish Sheriff's Deputy[.]" The defendant orally waived his right to a jury trial in open court on May 17, 2021.

A bench trial took place on October 26, and October 29, 2021. The trial court took the matter under review and on November 29, 2021, issued an eleven-page ruling captioned "Written Reasons." Therein, the trial court found the defendant guilty as charged of malfeasance in office. On February 24, 2022, the trial court sentenced the defendant to two years at hard labor with the sentence fully suspended and placed him on two-years of unsupervised probation. Additionally, the trial court ordered the defendant to pay a fine of $500 as well as court costs with a stipulation that he serve forty-five days in jail in the case of default.

The defendant's motion for appeal was granted on March 3, 2022. On March 17, 2022, the defendant filed a motion to reconsider sentence, asking the trial court to give him a deferred sentence under La.Code Crim.P. art. 893. The defendant's appeal was lodged with this court under docket number 22-324 on May 17, 2022. On May 19, 2022, this court remanded the appeal to trial court for disposition of the defendant's motion to reconsider sentence. On June 1, 2022, the trial court denied the defendant's motion to reconsider without prejudice, leaving open the possibility of refiling should the defendant successfully complete his

probation. The defendant's appeal was relodged with this court under docket number 22-413 on June 27, 2022.

The defendant now appeals his conviction, contending the state failed to prove the intent element of malfeasance in office

<u>**FACTS**</u>

On March 12, 2019, the defendant was working as a Rapides Parish Sheriff's Deputy employed as a correctional officer at the Rapides Parish Detention Center I. While other officers searched a pair of cells for a suspected shank, the defendant and another officer were in the hallway watching over the inhabitants of the two cells. Amongst them was Damien Francisco. While in the hallway, Mr. Francisco, who was handcuffed at the time, stepped away from the wall multiple times while speaking with the defendant and the other officer. The defendant shoved Mr. Francisco into the wall and, when Mr. Francisco stepped back from the wall again, the defendant executed a "take-down," slamming Mr. Francisco into the floor.

Trial began with the state calling Lieutenant Benson Thompson of the Rapides Parish Detention Center I. Lieutenant Thompson testified that on March 12, 2019, the warden alerted the lieutenants to the possibility of a shank in dorm 512, which initiated a search of two of the cells. According to Lieutenant Thompson, they removed the inmates from the two cells, secured them in the hallway, and searched the cells for the possible shank.

After reviewing his written narrative, Lieutenant Thompson testified he was the one who handcuffed Mr. Francisco and passed him to Deputy Fuller to bring him into the hall where the other residents of cells six and seven were being held. Lieutenant Thompson testified that during his interaction with Mr. Francisco, the

2

inmate did not threaten him, reach for any kind of weapon, or attack him physically. Lieutenant Thompson acknowledged he did not see the incident between the defendant and Mr. Francisco.

On cross-examination, Lieutenant Thompson testified a shank is "a knife or something to make puncture wounds." He noted a shank search is not a common occurrence and guards tend to be more on guard during such a search. Lieutenant Thompson testified the other inmates were immediately compliant with commands when informed a shank search was occurring, noting only Mr. Francisco was uncooperative. He testified Mr. Francisco's initial reaction was to state "fuck you, suck my dick." Lieutenant Thompson testified they then had to physically force Mr. Francisco against the wall so that he could be handcuffed. According to Lieutenant Thompson, Mr. Francisco then began cursing the deputy that was supposed to be escorting him into the hallway, so Lieutenant Thompson physically removed Mr. Francisco from the cell area. Lieutenant Thompson testified that he had never seen another deputy take an already handcuffed prisoner and slam or throw them face down onto the floor. He also clarified that Mr. Francisco's "noncompliance" was simply refusing to do what he was told; at no point did he attempt to attack anyone.

The state then called Lieutenant Christina Taylor of the Rapides Parish Sheriff's Office's Internal Affairs Division. Lieutenant Taylor testified she was assigned to investigate the instant offense on March 12, 2019. The state then introduced State's Exhibit 4, a DVD containing video from multiple cameras at the detention center around the time of the altercation between the defendant and Mr. Francisco. According to Lieutenant Taylor, she met with Mr. Francisco a week after the incident, noting no one had taken photographs of his injuries prior to that

3

point. Lieutenant Taylor testified she took photographs of Mr. Francisco's wounds, noting his lip appeared to be infected where a tooth had cut it, both lips were cut, and he had a chipped tooth. Lieutenant Taylor also stated that at the time of the incident, it was departmental policy within the Rapides Parish Sheriff's Office that officers were required to wear body cameras when working in DC I and that they were required to have said cameras on whenever they interacted with inmates. None of the deputies had their body cameras recording during this incident. Lieutenant Taylor stated she turned the matter over to the Criminal Investigations Division (CID), which ended her involvement in the case. She also noted that the Rapides Parish Sheriff's Office's policies and procedures manual states the following regarding use of force by deputies: "Deputies shall not use more force in any situation than reasonably necessary under the circumstances."

On cross-examination, Lieutenant Taylor, who viewed the video of the incident, testified she did not see the defendant try to break Mr. Francisco's fall, saying she saw Mr. Francisco "came off the wall a little bit, and then quick[l]y he was slammed to the – to the floor by Deputy Morrow." She confirmed that she did not observe Mr. Francisco make any aggressive or threatening movements toward the defendant in the video.

The state's next witness was Sergeant Anthony Peterson, a twenty-one-year veteran of the Rapides Parish Sheriff's Office. Sergeant Peterson testified that on March 12, 2019, he was a deputy working at DC I and was assigned to search the second to last cell during the shank-search. Sergeant Peterson stated they removed Mr. Francisco's cellmate, Cashman Cage, without incident. Mr. Francisco, however, did not want to be handcuffed, so he retreated to the back of the cell to avoid being cuffed. Sergeant Peterson did not recall if Mr. Francisco was cussing,

4

just that it took a while to get him handcuffed. He testified Mr. Francisco did not physically threaten or attempt to fight the officers and that he eventually turned around and let the officers handcuff him. He confirmed no contraband was found in Mr. Francisco's cell.

Sergeant Peterson testified that by the time he got into the hallway, Mr. Francisco was calm, on the ground, still handcuffed, and bloodied. On cross-examination, Sergeant Peterson noted Mr. Francisco was in a lock-down block where they typically kept younger inmates. Sergeant Peterson did not recall if Mr. Francisco exited the cell willingly or if Sergeant Thompson pushed him out of the cell. He noted that while Mr. Francisco was verbally noncompliant, he was never physically noncompliant, never jerked away from the officers or tried to attack them.

The state's next witness was Deputy Jeffrey Kurtz of the Rapides Parish Sheriff's Office. Deputy Kurtz testified he believed other officers had already cuffed the inmates and began moving them into the hallway when he arrived at the cellblock that was being searched. He testified he was in the hallway with the defendant during the search, although he stated he could not remember the name of the inmate he brought into the hallway. He did recall there being four inmates in the hallway with him and the defendant, and he recalled Damien Francisco being the last inmate brought into the hall. Deputy Kurtz described Mr. Francisco as "irate" and "unpredictable" but did not recall any specifics of what Mr. Francisco said beyond acknowledging he was screaming and cussing.

According to Deputy Kurtz, if any threat had been made to his or the defendant's safety, he would have documented it in his report. There was, however, no indication Mr. Francisco made a verbal threat or attempted to strike

5

either deputy. Although Deputy Kurtz stated he has been physical with an inmate before, he could not recall ever throwing an inmate to the ground when their hands were cuffed behind their back.

On cross-examination, Deputy Kurtz testified the cell block that was being searched was on the "maximum security side of DC I." Deputy Kurtz testified he was unaware at the time if any of the inmates had been searched prior to being brought into the hallway. Deputy Kurtz testified that although his attention was split between the defendant and Mr. Francisco and the other three inmates, he heard Mr. Francisco tell the defendant repeatedly that he did not have to listen to him. Deputy Kurtz also testified Mr. Francisco kept getting his left shoulder off the wall and turning toward himself and the defendant. Deputy Kurtz stated they were allowed to perform a takedown on someone who is handcuffed but also acknowledged deputies are taught to use "reasonable force."

The state then called Lieutenant Nicholas York of the Rapides Parish Sheriff's Office. Lieutenant York testified that he was not involved in the removal of Damien Francisco and Cashman Cage from their cell during the shank search as he was in the other cell. Lieutenant York stated he searched cell seven before being informed something had happened in the hallway. He noted Mr. Francisco was on the ground with blood around his mouth, still shackled with his hands behind his back. Lieutenant York testified he immediately called for medical personnel to attend to Mr. Francisco.

According to Lieutenant York, the nurse was unable to help Mr. Francisco in the hallway, so Lieutenant York and the defendant assisted Mr. Francisco to the medical office. Lieutenant York stated he was unaware of any other officers giving medical treatment or assistance to Mr. Francisco at the scene.

6

The state then called Deputy Justin Fuller of the Rapides Parish Sheriff's Office. Although Deputy Fuller testified that Mr. Francisco resisted being moved into the dorm and jerked away from him, he testified he did not recall Mr. Francisco threatening or attempting to attack any of the officers. He did not recall any contraband being found as a result of the shank search.

The state then called Damien Francisco. He testified his hands were cuffed behind his back and Lieutenant Thompson pulled him into the hall before he was pushed to where the defendant was. Mr. Francisco stated the defendant told him to get against the wall, he complied, then the defendant continued telling him to get against the wall. He stated the defendant shoved his face into the wall before slamming him into the ground. He testified he never gave the defendant permission to slam him.

Mr. Francisco testified that he never threatened anyone during the search, never attacked anyone, and that he had never been involved in an altercation with a guard prior to the incident with the defendant. Mr. Francisco admitted to a 2010 second degree battery conviction, a 2013 simple robbery conviction, and possession of contraband in a penal institution about six to eight months after the incident with the defendant. He also stated he suffered an injury to his lip and that his tooth was chipped. According to Mr. Francisco, the defendant kept yelling at him to "get on the wall, get on the fucking wall" prior slamming him into the ground, at which point the defendant began telling him to "stop resisting."

Mr. Francisco insisted that none of the officers had to push him out of the cell, that he left on his own after Sergeant Peterson told him they would not let anyone do anything to him. He also claimed that when he pled guilty to possessing a shank months after the incident with the defendant, he was lying because the item

belonged to his cellmate, but he just wanted to get the charge out of the way. He again asserted that he got against the wall when instructed to by the defendant, but the defendant continued yelling at him then shoved his face into the wall when he tried to point out that he was on the wall. Mr. Francisco then turned his head to ask why the defendant shoved him into the wall when the defendant slammed him into the ground. The state rested its case following Mr. Francisco's testimony. The defendant moved for an acquittal, which was denied by the trial court prior to the case recessing.

The defendant began his case in chief by recalling Lieutenant Christina Taylor. She confirmed that "each deputy is responsible for knowing that violation of statutory law could result in either punishment through the department or criminal responsibility." Although she did not speak to the defendant directly, Lieutenant Taylor testified she obtained the defendant's written report related to the incident in question with Mr. Francisco. Lieutenant Taylor noted the defendant's statement claimed he was familiar with Mr. Francisco from DC III, however, Mr. Francisco was never housed in DC III. Lieutenant Taylor noted that while officers are trained that there is always a potential for someone to be dangerous, they are also taught to only use force based upon an imminent threat.

The defendant then took the stand on his own behalf. The defendant testified that he has been a gun dealer for twenty-four years but noted that, in addition to being released from the Rapides Parish Sheriff's Office, the indictment for malfeasance resulted in his license to sell firearms being suspended. While stating he never attended the Rapides Correctional Academy training, he acknowledged receiving a copy of the written policy and procedures. The

defendant claimed that he knew someone named "Francisco" when he was stationed at DC III which he thought was the same person, but he was mistaken.

The defendant testified that cell block 512 housed "younger offenders that have either been arrested or convicted for violent crimes or serious crimes." However, he acknowledged he had no idea why Mr. Francisco was in jail at the time. He claimed he said very little to Mr. Francisco beyond trying "to get him to just comply and even de-escalate the situation." The defendant contended Mr. Francisco was noncompliant the entire time and was ignoring commands from himself and Deputy Kurtz. He disagreed with Lieutenant Taylor's characterization that Mr. Francisco's feet came off the ground when the defendant shoved him into the wall. The video shows that when the defendant shoved Mr. Francisco into the wall, it forced Mr. Francisco onto his toes with his heels coming off the ground.

According to the defendant, he took Mr. Francisco's subsequent attempt to turn his head as an "act of aggression" and took him down. He contends, however, he attempted to break Mr. Francisco's fall. The defendant denied having any intent to injure Mr. Francisco. The defendant testified he has been attacked while working in the jails four times, noting he was taken to Cabrini Hospital via ambulance after one of the attacks.

The defendant testified he was initially stationed at DC III upon being hired by the sheriff's office, was transferred to assignment as a road deputy, then was reassigned to DC III. He noted he spent about a year and a half on the road before being reassigned to corrections in October of 2016. The defendant claimed he was removed from the road because of "politics," although he subsequently acknowledged there were "discipline issues" involved. He also acknowledged that he was transferred from DC III to DC I in 2018 following a disciplinary issue in

9

which he was found to have called an inmate "the 'N' word," although the defendant contended it never happened. He also claimed the other two deputies who gave statements they heard him use the derogatory term were lying.

The defendant testified he had never executed a takedown on a handcuffed inmate, nor had he seen any other officers use such a takedown on a handcuffed inmate. Again blaming his superiors at DC III, he acknowledged that he was disciplined in relation to the 2014 incident wherein he claimed he was attacked for the first time. The defendant claimed that, contrary to the testimony of every other officer at trial, Mr. Francisco threatened the defendant prior to the defendant's slamming Mr. Francisco face-first into the ground. When asked if Mr. Francisco ever attempted to strike him, he claimed he "prevented that." The defendant again claimed that Mr. Francisco's act of turning his head towards him was a threat to his safety. The defendant concluded cross-examination by again claiming that every time he has gotten in trouble with the department it was political. With that, the defense concluded its case.

On November 29, 2021, the trial court issued a written opinion in which it found the defendant guilty of malfeasance in office. Therein, the trial court found defendant "violated a lawfully required duty by performing it in an unlawful manner." The court found the defendant was "in control of the situation the entire time," and therefore used unreasonable force in slamming Mr. Francisco face-first into the floor when no other officer perceived him to be a threat.

## ASSIGNMENTS OF ERROR

The District Court committed manifest error when it:

1. Failed to analyze the intent element of malfeasance in office, and

2. Found Jeremy Morrow guilty beyond a reasonable [doubt] of intentionally performing his lawful duty in an unlawful manner

where [a] reasonable, possible hypotheses of innocence remain[ed] present, and

3. Incorrectly extended the definition of battery to Jeremy Morrow's actions giving rise to this matter.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

## DISCUSSION

The defendant asserts three errors made by the trial court, namely, that the state failed to prove the necessary intent to convict the defendant of malfeasance in office. The defendant explicitly contends the trial court erred in (1) failing to analyze the intent element of the malfeasance statute, (2) finding him guilty of intentionally performing his lawful duty in an unlawful manner without considering a reasonable hypothesis of innocence, and (3) incorrectly extending the definition of battery to include the defendant's actions.

The analysis for insufficient-evidence claims is well settled:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

On March 12, 2019, La.R.S. 14:134 pertinently stated:

A. Malfeasance in office is committed when any public officer or public employee shall:

(1) Intentionally refuse or fail to perform any duty lawfully required of him, as such officer or employee; or

(2) Intentionally perform any such duty in an unlawful manner; or

(3) Knowingly permit any other public officer or public employee, under his authority, to intentionally refuse or fail to perform any duty lawfully required of him, or to perform any such duty in an unlawful manner.

The defendant contends the trial court could not have found him guilty because there is no evidence that he intentionally performed his lawful duty in an unlawful manner. The defendant contends the state must show specific intent to perform his duty illegally.

Louisiana R.S. 14:134 does not criminalize all ethical violations and/or general derelictions of duty. The object of the malfeasance statute is to punish a breach of duty committed with the required culpable state of mind. To this end, the statute expressly limits its application to instances in which a public officer or employee *intentionally* refuses or fails to perform or *intentionally* performs in an unlawful manner, any affirmative duty imposed by law upon him in his role as a public servant. The inclusion in the statute of a criminally culpable state of mind makes it clear that it applies only where the statutorily required *mens rea* is proven beyond a reasonable doubt. Thus, mere inadvertence or negligence, or even criminal negligence, will not support a violation of the malfeasance statute because the statute specifies the act or failure to act must be intentional.

*State v. Petitto*, 10-581, p. 13 (La. 3/15/11), 59 So.3d 1245, 1254.

In *State v. Ballard*, 17-835 (La.App. 4 Cir. 3/21/18), 239 So.3d 400, the fourth circuit reviewed a malfeasance in office conviction resulting from a reserve officer kicking a suspect in the mouth during an arrest. The suspect was already face-down on the ground with two officers handcuffing him when the defendant ran up and kicked the suspect in the mouth. Although the defendant attempts to

12

dismiss *Ballard* as inapplicable due to the factual difference between kicking a suspect on the ground with slamming an inmate face-first into the floor, the *Ballard* court correctly sets forth the standard appellate courts should use in reviewing a malfeasance in office case which arises out of a law enforcement officer using unreasonable force. The *Ballard* court stated:

> Reasonable force is allowed to make an arrest and detention, and to overcome any resistance or threatened resistance of the person being arrested or detained. *Kyle v. City of New Orleans,* 353 So.2d 969, 972 (La.1977); *Estate of Francis v. City of Rayne*, 07-359, p.6 (La.App. 3 Cir. 10/3/07), 966 So.2d 1105, 1110. The totality of the circumstances must be considered when determining if the force used is reasonable. Therefore, the trial court must evaluate the officer's actions comparing them to those of an ordinary, prudent and reasonable man placed in the same position as the officer and with the same knowledge as the officer. *Kyle*, 353 So.2d at 973.

239 So.3d at 405.

Mr. Francisco was an inmate and was therefore, by definition, being detained. The trial court in *Ballard*, faced with a defendant who claimed his kick was completely inadvertent and the result of his knee giving out and another officer who testified the kick was intentional and unnecessary, found the defendant intentionally used unreasonable force. The fourth circuit affirmed that determination. The trial court in the instant case made the same determination, namely, that the defendant used an unreasonable amount of force on Mr. Francisco:

> Defendant was a sheriff's officer—a law enforcement officer— charged with protecting and upholding the laws and constitutions of the State of Louisiana and the United States of America. Citizens, including inmates, look to these officers for protection and to maintain order and stability. Based upon the evidence presented, Defendant crossed the line between reasonable and unreasonable force. As noted throughout the witnesses' testimonies, force is to be used to gain compliance. The court would agree, based on the initial behavior of Francisco, some force should have been employed. And, clearly it was, as Francisco was ultimately cuffed and removed to the hallway. Thus, by the time he was on the hallway, Francisco was in a position

where he was no longer in control—the deputies were. Simply put, the force used by Defendant went above and beyond what was necessary to maintain control. Defendant's explanation is merely another instance in a long list of him failing to take responsibility for his actions.

The defendant contends his actions were reasonable and necessary; therefore, the state failed to prove his intent to perform his duty unlawfully. In *Ballard*, the defendant likewise contended that his claim he inadvertently kicked the suspect meant the state could not prove intent. The court disagreed:

> [c]onflicting statements as to factual matters is a question of weight of the evidence, not sufficiency. *State v. Jones*, 537 So.2d 1244 (La.App. 4 Cir. 1989). Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. *Id.* A trier of fact's determination as to the credibility of a witness is a question of fact entitled to great weight, and its determination will not be disturbed unless it is clearly contrary to the evidence. *State v. Vessell*, 450 So.2d 938 (La. 1984).

*Ballard*, 239 So.3d at 405-06 (quoting *State v. Wells*, 10-1338, p. 5 (La.App. 4 Cir. 3/30/11), 64 So.3d 303, 306).

Aside from the defendant and Deputy Kurtz, every officer who testified stated they believed the force used by the defendant against Mr. Francisco was unreasonable. While the defendant is correct that Deputy Kurtz was the only officer in the hallway with him and Mr. Francisco and Deputy Kurtz testified he did not believe the force was unreasonable, Deputy Kurtz was the least experienced officer involved. At trial in October of 2021, Deputy Kurtz testified he had been at DC I for almost three years; the incident took place on March 12, 2019, meaning Deputy Kurtz would have been at DC I for less than six months at the time. Additionally, Deputy Kurtz testified he did not recall the specifics of what Mr. Francisco said but acknowledged his report did not contain any threats against himself or the defendant. Aside from the defendant's testimony, there was no evidence to support his claim Mr. Francisco had threatened him or was acting

14

aggressively towards him. Given the evidence presented, we cannot say the trial court erred in finding the other officers were correct that the defendant used an unreasonable amount of force against Mr. Francisco.

The defendant has argued that because his intent was based upon circumstantial evidence, the state failed to disprove every hypothesis of innocence and therefore the trial court could not have found him guilty beyond a reasonable doubt. This argument appears to be based upon La.R.S. 15:438, which states "The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." The "must exclude every reasonable hypothesis of innocence" standard only applies where a conviction is based solely on circumstantial evidence. Here, the trial court heard testimony from three witnesses who were present at the time of the incident in addition to being able to observe the incident itself on video. Given the presence of such direct evidence, the court need not exclude every reasonable hypothesis of innocence and the defendant's contentions to the contrary are simply misplaced.

Finally, the defendant contends the trial court erred in defining his use of force against Mr. Francisco as a battery. The defendant contends this means law enforcement could never use force against an inmate or a suspect regardless of the actions of the inmate or suspect. This is nothing more than an attempt at fear mongering. Most importantly, while the trial court may have used the word "battery," the defendant was not on trial for committing a battery, he was on trial for committing malfeasance in office as a result of his inappropriate use of unreasonable force while working as a law enforcement officer. As noted in *Ballard*, "the trial court must evaluate the officer's actions comparing them to

15

those of an ordinary, prudent and reasonable man placed in the same position as the officer and with the same knowledge as the officer." 239 So.3d at 405. The trial court compared the defendant's actions against those of other officers who testified the use of force was unreasonable. Those other officers should be considered "ordinary, prudent and reasonable [man]." *Id.*

## CONCLUSION

The defendant's assignments of error lack merit. His conviction and sentence are affirmed.

**AFFIRMED.**